# APPENDIX.

QUESTIONS SUBMITTED BY THE HOUSE OF REPRESENTATIVES, MARCH 20, 1901, WITH ANSWERS OF THE JUSTICES OF THE SUPREME JUDICIAL COURT THEREON.

Article VI, § 3, of the Constitution of Maine does not require the Justices to give their opinion upon all questions that may be asked of them by either of the branches of goverment named.     They are not obliged, and it would not be proper for them, to answer questions of policy or expediency, or any questions other than "important questions of law."

It is equally essential, in order that the Justices be required to give their opinion, that the questions be submitted upon a solemn occasion; and, however important may be the questions of law submitted, if it clearly appears to the Justices that such an occasion does not exist, it is their duty to decline to give their opinion in answer to such questions.

WISWELL, C. J., STROUT, SAVAGE, FOGLER, POWERS, JJ., declining to answer the questions submitted.

EMERY, WHITEHOUSE, PEABODY, JJ., answering the questions submitted.

### STATE OF MAINE.

*In House of Representatives, March 20, 1901.*

*Ordered:* The Justices of the Supreme Judicial Court are hereby requested to give to this House, according to the provisions of the Constitution in this behalf, their opinion on the following questions, viz:

1. Is the office of Fish and Game Commissioner of the State of Maine, or trustee of any State institution, an "office of profit under this State" within the provisions of section 11 of part third of Article IV of the Constitution, which prohibits any person holding an office of profit under this State from having a seat in either house of the legislature, during his holding such office?

2.   Is it necessary for a Fish and Game Commissioner or such trustee, to resign or otherwise cease to hold that office, before he can be legally elected and qualify as a representative to the legislature?

3.   If a person holding the office of Fish and Game Commissioner or such trustee, is elected a representative to the legislature, and takes the oath of office as such representative, does such person thereupon and thereby cease to be a Fish and Game Commissioner or such trustee?

4.   Can a member of the present legislature be legally appointed a Fish and Game Commissioner or such trustee, after adjournment of the legislature without first resigning his seat in the legislature?

HOUSE OF REPRESENTATIVES,
Mar. 20, 1901.

Read and passed by the House.
Attest:

W. S. COTTON, Clerk.

Opinion of WISWELL, C. J., STROUT, SAVAGE, FOGLER, POWERS, JJ.

*To the Honorable House of Representatives of the Seventieth Legislature* :—

The foregoing questions propounded to the Justices of the Supreme Judicial Court, by an order passed by your House upon March 20, 1901, were received by the Chief Justice on the 26th day of that month, four days after the final adjournment of the Legislature.

Article VI. § 3 of our Constitution provides that the Justices " shall be obliged to give their opinion upon important questions of law, and upon solemn occasions, when required by the Governor, Council, Senate or House of Representatives."

But this provision of the Constitution does not require the Justices to give their opinion upon all questions that may be asked by either of the branches of government named.   They are not obliged,

and it would not be proper for them, to answer questions of policy or expediency, or any question other than "important questions of law." It is equally essential, in order that the Justices be required to give their opinion, that the questions be submitted upon a solemn occasion; and, however important may be the questions of law submitted, if it clearly appears to the Justices that such an occasion does not exist, it is their duty to decline to give their opinion in answer to such questions.

This has been the construction placed upon this clause of the Constitution by the Justices of this court and of the Massachusetts and New Hampshire courts, in the Constitutions of which states are found similar provisions, in numerous instances, some of which will be later referred to. And this conclusion necessarily follows from the language of the Constitution and from our theory of government, in accordance with which the three branches of government, executive, legislative and judicial, are made, so far as possible, separate and independent of each other. Upon this account it would not be proper for the members of the court to give an official opinion, outside of judicial proceedings, which might have the effect of influencing the action of other departments of government, except upon such occasions as are within the contemplation of the Constitution. Another reason why it would be improper for the Justices to answer any question submitted, unless upon a solemn occasion, is, that such questions frequently affect the individual rights of citizens, and, unless the occasion is within the contemplation of the Constitution, the question should be submitted in a judicial proceeding where all persons interested may have an opportunity to appear and be heard in their behalf. An opinion given in answer to questions thus propounded, without notice, hearing or argument, although it has not the binding force of a judgment of court, is certainly prejudicial to the interests of those to whom it is adverse.

The questions submitted at the present time are undoubtedly important questions of law, it therefore becomes necessary to determine if they were submitted upon a solemn occasion. It has been said that this language of the Constitution means some serious

and unusual exigency, such an exigency as exists when the body making the inquiry, having some action in view, has serious doubts as to its power and authority to take such action under the Constitution or under existing statutes. But it would not be wise to attempt to give a definition of this expression which would cover all cases. It is sufficient to say, that such an occasion does not exist unless the body making the inquiry has occasion to consider and act upon the questions submitted in the exercise of the legislative or executive powers intrusted to it by the Constitution and laws of the state. As was said in a recent answer by the Justices of the Massachusetts court: " Many opinions of the Justices have been required and given, but it is found upon examination that they were given in cases where the branch of the goverment requiring the opinion had pending before it some question concerning which doubts existed as to its power and authority, or as to the power of some subordinate officer under the Constitution, or under existing statutes, and where the settlement of such doubt was necessary to enable it, in the exercise of its proper function, to act legally and intelligently upon the pending question." 148 Mass. 623.

But it has been suggested, that it is not proper for the Justices to consider the question as to whether or not a solemn occasion existed when the important questions of law were submitted; that the House of Representatives, having propounded the questions, must have determined that such an occasion did exist, and that its determination is to such an extent final and conclusive upon the Justices that it cannot be inquired into by us; that this preliminary question is a legislative and not a judicial one. We can not concur in this proposition, or with the arguments urged in its support. It is not supported, so far as we are aware, by any judicial opinion, while in a number of instances in this state and in Massachusetts and New Hampshire, under similar constitutional provisions, the Justices have first determined whether or not a solemn occasion existed, and have then answered or declined to answer in accordance with their determination of this preliminary question.

The Justices are required to give their opinion in answer to important questions of law upon a certain condition: it would be

improper, as we have seen, for them to give an opinion except upon that condition; it necessarily follows, we think, that the Justices must determine, each undoubtedly for himself, whether or not that condition existed, although in cases of doubt it may be the duty of the Justices to resolve that doubt in favor of the prerogative of the body propounding the question.

These views are so entirely supported by the opinions of the Justices of this court, and of the courts in the other states referred to, that we do not deem it necessary to enter into an historical review of the precedents in this country and in England prior to the adoption of the Constitutions in the States referred to, because in these States the privileges of the two Houses of the Legislature do not, as in England, depend upon usages and legislative resolves, but are limited and defined by written constitution. But we beg leave to briefly refer to some authorities in support of the general principles above stated.

In the answers of the Justices to a question asked by the Executive Council, 72 Maine, 542, Justices LIBBEY and WALTON vigorously protested that the occasion was not a solemn one and that it was consequently improper for them to give an opinion. They said that the purpose of this clause of the Constitution was to enable the Governor, Council, Senate or House of Representatives to obtain the opinion of the Justices upon any important question of law, of public concern, "which the body making inquiry has occasion to consider and act upon in the exercise of the legislative or executive powers intrusted to them respectively, for their guidance in their action." They only consented to answer the question because the other Justices were of a different opinion upon this preliminary question and because, as they said: "In cases of doubt it may be the duty of the court to yield in favor of the prerogative of the body propounding the question."

In 1891, the Governor asked the Justices their opinion upon a question in relation to the power of the Governor to remove a county attorney. All of the eight members of the court at that time, of whom only Justices EMERY and WHITEHOUSE now remain upon the bench, joined in an opinion in which they said: "We

are of the opinion that the facts stated do not indicate that any solemn occasion exists within the meaning of the Constitution of the State, which requires any expression of opinion of the court upon the question presented." They gave as an additional reason for refusing to answer, that the question could be speedily determined in a judicial proceeding which might be instituted under the statute, and said, " we think it inexpedient to prejudice the question before any occasion has arisen calling for its legal examination." Opinion of the Justices, 85 Maine, 546.

The Justices of the Massachusetts court were requested by the House of Representatives, in 1877, to give their opinion as to whether a certain judicial officer had vacated his judicial office by accepting a seat in the House. They declined to ·answer the question upon the ground that the occasion was not within the contemplation of the Constitution, saying, among other things: "In view of the separation, established by the Constitution, between the legislative, the executive and the judicial departments of the government, we can hardly suppose it to have been the intention that either the the legislative or the executive should demand of the judiciary its opinion, in advance, upon a question which may arise in the course of judicial administration, and which can not be affected by legislative or executive action." Opinion of the Justices, 122 Mass. 600.

In the Opinion of the Justices, 126 Mass. 557, although in that case it was determined that the occasion was one that came within the contemplation of the constitution, and the questions submitted were consequently answered, it is said : " The opinions of the Justices can be required only ' upon important questions of law,' not upon questions of fact, and ' upon solemn occasions,' that is to say, when such questions of law are necessary to be determined by the body making the inquiry, in the exercise of the legislative or executive power intrusted to it by the constitution and laws of the Commonwealth."

Again, in 1889, the House of Representatives of the Massachusetts Legislature propounded the questions to the Justices in regard to the meaning of certain sections of the Public Statutes. The

Justices, in their opinion, reaffirmed the construction previously placed upon this clause in the Constitution of that State, to the effect, that the opinion of the Justices could only be required "upon solemn occasions," and declined to answer the questions submitted, saying, "this is not an unusual exigency, and does not create or present a solemn occasion within the fair meaning of the constitution, so that we can properly give an ex parte opinion upon the construction of the statute in question." This opinion was joined in by every member of the court. Opinion of the Justices, 148 Mass. 623.

The Justices of the Court of last resort in New Hampshire have upon at least two occasions declined to give an opinion to questions propounded, in one case by the House of Representatives, and in the other by the Governor and Council. In both opinions the Justices placed much stress upon the independence of the three branches of government, legislative, executive and judicial, and upon the impropriety of members of one branch interfering with the duties or functions of another unless within the exceptions expressly made by the Constitution, whereby the branches of government named might require the opinion of the Justices "upon important questions of law and upon solemn occasions." Upon both of these occasions the Justices determined that it would be improper for them to answer the questions propounded and consequently declined to do so. These opinions are contained in 56 N. H. 574 and 67 N. H. 600.

In view of these authorities, entirely supporting our own conclusions, we have no doubt that it is our duty, before we are justified in answering questions propounded in this manner, to determine whether or not a solemn occasion existed at the time of the submission of such questions, within the meaning of the Constitution; and that if we are clearly of the opinion that no such occasion existed, to decline to answer the questions.

It only becomes necessary to apply these general principles to the circumstances and conditions existing at the time these questions were submitted. The order requesting our opinion upon these questions concerning the eligibility of certain members of

the House, passed the House after the Legislature had been in session for nearly three months, and very shortly before its final adjournment. When these questions were submitted to us, the Legislature had finally adjourned. At that time the House had no question before it for consideration or action. No opinion given by us in answer to the questions submitted could be of any value or assistance to the House in passing upon the qualifications, or eligibility of any of its members, or for any other purpose. It could not be used by the House for its guidance in passing upon any question pending before that body. In fact, our opinion in answer to these questions could not even be submitted to the House. It is not enough that an opinion rendered at this time might be useful for the guidance of some future House of Representatives, if the same questions should ever arise. An opinion given upon this ground would be an unwarrantable interference with the duties and functions of such future House of Representatives, which is made by the Constitution "the judge of the elections and qualifications of its own members." If such questions should subsequently arise in a future Legislature, and either House should then request our opinion concerning them, at a time when it could be rendered so as to be submitted to it for its guidance, it would undoubtedly be our duty under the Constitution to give an opinion in answer.

Inasmuch as the questions propounded also involve the title of individuals to certain offices or trusteeships of state institutions, the result would be, if we should answer the questions at this time, that we should give an opinion which could not even be submitted to the body requesting it, while at the same time, without notice to the persons interested, and without hearing and argument, we should prejudge questions involving the rights of individuals, which questions might subsequently come before us for a judicial determination.

It is true, that the Seventieth Legislature still exists, and it is within the range of possibilities that such an extraordinary occasion may arise as to require the Governor to convene the Legislature in extra session. But such a contingency is so extremely

remote that it need hardly be taken into consideration. If it should occur, we should then undoubtedly feel it our duty to submit an opinion in answer to the questions in such season that it could be made use of by the House.

For these reasons, the undersigned, Justices of the Supreme Judicial Court, with great deference to the Honorable House of Representatives, must most respectfully decline to give an opinion upon the questions submitted.

ANDREW P. WISWELL,

SEWALL C. STROUT,

ALBERT R. SAVAGE,

WILLIAM H. FOGLER,

FREDERICK A. POWERS.

December 2, 1901.

---

Opinion by EMERY, WHITEHOUSE, PEABODY, JJ., giving answers to the questions of the House.

*To the House of Representatives :*

Notwithstanding the reasons so ably stated by the other Justices for declining to give their opinion on the questions of law propounded by the House of Representatives, in its order of March 20, we, the undersigned Justices, after consideration have regretfully come to the conclusion that we are obliged by the Constitution to give the opinion required. Before giving that opinion, however, the respect due, and which we have for, the views of the refusing Justices requires us to state at some length the reasons for our own conclusion as to the duty of the Justices under the order.

The language of the constitutional provision, Art. VI, § 3, under which our opinion is required, is explicit and mandatory. It leaves nothing to the discretion of the Justices. That it is onerous upon the Justices,—that it may at times cause them great embarrassment to give opinions more or less hurriedly without the aid of opposing arguments,—that it may injuriously affect personal or property rights without giving the person affected an opportunity to be heard,—that it may be abused by those branches of the

government entitled to use it,—or, generally, that it has proved to be an unwise provision detrimental to the principle of the separation and independence of the three departments of government, (if such criticisms be well founded) cannot, of course, justify any Justice in refusing to render this constitutional provision complete obedience, or to effectuate its full purpose. It is the paramount law, binding upon the Justices of the Court until the people see fit by constitutional amendment to relieve them of the burden. Nor is this provision a new departure, to be for that reason construed hesitatingly and narrowly. On the contrary, it is a continuation and extension of a power and practice derived from England and exercised by the Colonial governments of Massachusetts. Opinions of the Justices, 126 Mass. 557. It is within the expressed exception to the separation and independence of the departments of government. Art. 11, § 2.

In view of some objections made, it may properly be noted here that it is not now questioned that the opinions given under this constitutional provision are not adjudications, and are not within the principle of stare decisis. They are merely opinions in the way of advice, like those of counsel. The justices giving them are in no degree bound to adhere to them when the same questions arise again, should argument or further research and reflection change their prior views.

As justifying their refusal to give their opinion as required, we understand the refusing Justices to practically assert a general and preliminary proposition, viz:—that when their opinion is required, the Justices must first consider and determine (each for himself of course) not only whether the questions are questions of law,—but also whether they are important,—and whether the constitutional occasion exists,—and then should answer, or refuse to answer, according to such determination. We further understand them to assert a second and more special proposition, viz: that they must not give their opinion upon any question of law, even of constitutional law, for the benefit of the government as a whole, or its officers, or the people at large,—however important the question to the public welfare and however pressing for solution,—unless the

particular branch or body requiring the opinion (in this case the House of Representatives) has itself "occasion to consider and act upon the questions submitted."

In view of the application afterward made by the refusing Justices of the foregoing propositions to the questions now before us, we do not think we have any occasion here to undertake their refutation.    They are not in the road by which we reach our conclusion that we are obliged to answer these particular questions.    Still, if we ignore them we may be understood as acquiescing in them, which we are not now prepared to do, as we think their unquestioned acceptance may conflict with other important principles of constitutional law, and have unforeseen and embarrassing consequences.    Therefore, without now denying either proposition, we think it right to suggest some considerations which may tend to show that both are debatable and should not be accepted as established.

1.    We do not find anything in the Constitution in terms specifying that the Justices are the sole and final interpreters of this provision, to the exclusion of those branches of the government empowered to require opinions.    Whether the questions submitted for opinion are questions of law, is itself a question of law, and hence a judicial question necessarily to be determined by the Justices as the holders of the judicial power.    Also, it may be necessary for the Justices to first determine whether the questions are of public interest affecting the commonwealth.    *Allen* v. *Jay* 60 Maine, 124.

But, even upon these questions, the Justices are to resolve all reasonable doubts in favor of the branch requiring the opinion. *Lunt's case*, 6 Maine, 412.    Whether the questions submitted are important,—or whether there be sufficient occasion for their solution,—is not itself a question of law, or a judicial question.    These are rather political questions in the broad sense of that term. When the requirement is made by the House of Representatives, they are pre-eminently questions for the House itself to consider and determine.    The House is a political agent of the ·people.    It has the sole power of impeachment.    It is the grand inquest.

With the Senate and the Governor, it is the judge of what is for the people's welfare,—is charged with the duty of seeking out abuses, disorders and irregularities in the public service, and is also charged with the duty of their reform or removal. The Justices are by the Constitution (Art. 2, § 2,) excluded from that sphere of duty and action, and limited to judicial questions. Even in cases where all the facts and conditions are public and known to all the Justices, it is certainly doubtful if they are to override the judgment of the representatives of the people that those acts and conditions render the questions of law important and the occasion solemn. But the Justices can never be sure they know all the facts and conditions. There may be, perhaps in this case, many facts and conditions known to the House and not known to the Justices, clearly showing the given question to be important and the occasion sufficiently solemn. It has never been the practice, nor is the House obliged by anything in the constitution, to state facts affirmatively showing the question to be important and the occasion solemn. We do not think the Justices should treat the House as a suitor, nor its order like a petition demurrable for want of sufficient allegation of facts.

Arguments from analogy may be adduced. In the grant of legislative power is a limitation that the laws and regulations to be made and established shall be "reasonable." Art. 4, Pt. 3, § 1. Yet this court has judicially determined after argument, that the legislature is the sole judge as to what is "reasonable" in the exercise of the legislative power, and that the court cannot review the legislative judgment in that respect. *Moor* v. *Veazie*, 32 Maine, 343, 360. If the court is bound to defer to the legislative judgment of what is "reasonable," why should its justices assume to say that the legislature, or one of its Houses, does not know what is "important?" Again, the constitution places this limitation upon the legislative power, viz: "private property shall not be taken for public use without just compensation; nor unless the public exigencies require it." Art. 1, § 21. Yet this court has judicially held, after argument, that the legislature is the sole judge of when the "public exigencies" exist, and that the court cannot

override its judgment upon that question. *Spring* v. *Russell*, 7 Maine, 273, cited with approval with other similar cases in *Allen* v. *Jay*, 60 Maine, 124, pp. 138, 139. If the legislature can exclusively determine whether an occasion is "exigent," why may not it also determine whether an occasion is "solemn?" The term "public exigency" seems to be full as grave as the term "solemn occasion." Indeed, as used in legal nomenclature, "solemn" means no more than formal, regular, as "probate in solemn form," "to solemnize a marriage," etc. Cent. Dict. Burrill's Law Dict. Anderson's Law Dict.

It is true, as stated by the refusing Justices, that in Massachusetts, New Hampshire and Maine, (the three States with this peculiar constitutional provision) the Justices in each State, in the instances cited, asserted the proposition relied upon by them and now being considered. We think, however, it will appear in those late instances that the proposition was assumed, rather than demonstrated or even reasoned out. The doctrine is of late origin. We do not find it advanced in Massachusetts till 1877, nearly a century after the adoption of the Constitution,—nor in New Hampshire till 1875, nearly a century after the adoption of that Constitution. We do not find it even mooted in Maine before 1870, and then only mooted by a single Justice (KENT) in the *Cleveland case*, 58 Maine, 564, and perhaps suggested by Justice CUTTING, 58 Maine, 599. It was not again mooted in Maine till 1881 in the *Spaulding case* in 72 Maine, 542, and then only by two Justices, WALTON and LIBBEY. It was not asserted and acted upon in this State till 1891, in the *County Attorney case*, 85 Maine, 545, more than a century after the constitution of 1780, under which the people of Maine had lived for forty years before adopting the same provision in their own constitution.

We can find no precedent in Massachusetts for this doctrine thus first assumed there in 1877. In every prior case, beginning in 1781, the Justices returned answers to a great variety of questions without at all first considering their importance or the occasion. It never seems to have before occurred to the Justices that they should do so. In two instances, (one where the question was what

taxes the Western Railroad Company should pay the State, 5 Met. 596,—the other where the question was whether a certain savings bank was subject to the general law, 9 Cush. 604) the Justices (including those legal giants, Lemuel Shaw and Caleb Cushing) prefaced their answers with the observation,—that, thinking the questions were not within the spirit of the constitution, they at first thought of requesting the House [Senate] to withdraw the questions and relieve them from answering, but the House, [Senate] in each case having adjourned, or being about to adjourn, they found this impracticable and proceeded to answer. The Justices did not intimate, and evidently did not think, they could judge for themselves whether they should answer. At the most, they only thought of asking the House to reconsider the matter. In the Mass. Const. Convention of 1820, that eminent constitutional lawyer, Joseph Story, speaking of this provision, said, "as the constitution now stands, the Judges are bound to answer if insisted upon, even in a case where private rights are involved and without the advantage of argument." Debates in Mass. Const. Conv. 1820 pp. 489, 490. In the Mass. Const. Conv. of 1853, Marcus Morton, who had served with distinction both as Governor and Judge, said:—"They [the Justices] feel bound to give an opinion." Debates &c., 1853, p. 694. The refusal of the Massachusetts Justices to answer questions of the House in 1889 was met by the vigorous protest of the House re-asserting its right by a nearly unanimous vote,—168 to 8. Mass. House Journal, May 16, 1889.

In Maine, though this constitutional provision had been often made use of, we do not find any instance prior to the solitary instance in 1891, already cited, where the Justices claimed the right to determine for themselves the importance of the question and the sufficiency of the occasion. In the *Cleveland case*, in 1870, 58 Maine, 564, Mr. Justice KENT intimated an opinion that the question was not within the constitution; but he did not intimate that he could therefore constitutionally refuse to answer, and he did answer. In the *Spaulding case*, in 1881, 72 Maine 542, Justices WALTON and LIBBEY gave it as their personal opinion, by way of

protest, that the occasion was not one within the constitution, but they did not assume therefore to refuse to answer. They yielded to the authority of the Council. This they should not have done, and would not have done, unless they believed it to be their duty to do so. It was their duty to refuse to answer, if they believed they could constitutionally refuse. The constitution allows the Justices no discretion whether to answer or not. It is simply a question of constitutional duty one way or the other, and Justices WALTON and LIBBEY by answering, notwithstanding their own personal opinion that the question was not within the purview of the Constitution, thereby stated it to be their duty to answer never- theless. Three of the Justices answered the question as a matter of course without noticing the protest. The remaining three Jus- tices said in relation to it:—"The opinion of this court has been required in some forty instances in relation to a variety of subjects and under different circumstances. In no instance has the obliga- tion to answer been questioned, or an answer denied." In the famous " Count out" instances in 1879, 72 Maine, 560, it is matter of history that the duty and right of the Justices under this pro- vision were much discussed by the public. Noticing this, the Jus- tices said:— " We cannot decline an answer, if we would—. . . We have no more right to decline the exercise of a jurisdiction which is given, than to usurp that which is not given. The one or the other would be treason to the constitution. Questions may occur which we would gladly avoid, but we cannot avoid them."

Against this long and unbroken array of precedents for more than a century, forty years under the Massachusetts constitution and eighty years under our own similar constitution,—and against the opinions of the eminent jurists cited,—we have in this State but the one late solitary instance where the Justices refused to answer a question duly propounded,—that in 1891, when the Justices refused to answer the inquiry of the Governor as to his power to remove a county attorney (85 Me. 545.) There was no discussion of the matter. The Justices simply assumed the right to refuse to answer, and even then, as if it was a matter of discretion rather than of duty, they placed their refusal rather

upon the ground of inexpediency, since the question could be reached in a judicial proceeding. They apparently over-looked the fact that a short time before, after mooting and considering practically the same objection, the Justices had answered a similar question as to the power of the Governor to remove from office the Reporter of Decisions. (72 Me. 542). The undersigned Justices, EMERY and WHITEHOUSE, concurred in the refusal to answer in the later case, 85 Maine, 545, but wider research, and more mature consideration, have now convinced them that they were then in error.

II.　As to the second and more specific proposition that answers must be refused unless the branch, requiring the opinion itself "has occasion to consider and act upon the questions submitted," that doctrine seems equally new and strange. We do not find in the language of the constitution any such limitation upon the power to require opinions. We do not find it advanced in any instance prior to 1875 in New Hampshire, 1877 in Massachusetts, nor until now in Maine. Against the broad assertions that all the questions theretofore answered were within the rule of this doctrine, we think we may safely say it very rarely appears affirmatively in any instance that the branch asking the question, in fact had the matter of the question before it for action. We think there are instances to the contrary, where it affirmatively appeared the asking branch did not have the matter before it, and some where it could not act in the matter at all.

In Massachusetts, in 1852, (9 Cush. 604) the Senate asked whether a certain savings bank, specially chartered in 1816, became subject to general laws passed afterward. It is difficult to see what effect an answer either way could have upon the action of the Senate. If the bank was not subject to the general laws, the Senate could not make it so. If it was so subject, it is hardly conceivable that the Senate would therefore change the general laws governing all banks.

In 1855, the Governor and Council asked several questions. (3 Gray, 601). The constitution had been amended changing the manner of electing the Executive Council, and also making certain

state officers elective instead of appointive. A part of the first question was this,—"Will the said article (of Amendment) affect the manner of the election of the next executive council?" Clearly the Governor and Council asking that question could not act in the matter. Question IV was whether the present commission of any officer appointed under the old constitution, but whose office was made elective by the amendment, was affected by the amendment. It is evident the Governor and Council could not do anything about that matter either way. Another question, VII, was whether the usual November Term of the Court of Common Pleas was abolished by the statute establishing the Superior Court,—and also as to what was to be done with the writs and processes returnable to that term of the Common Pleas Court,—and also what was the effect of the statute on the Municipal Court business for October? These were matters manifestly outside of any possible action of the Governor and Council. All these questions were evidently asked for the public benefit, for information of suitors and persons other than the Governor and Council. They were all answered without objection or hesitation.

In Maine, in 1822, (2 Me. 430), Gov. Parris, who was a member of the Maine Constitutional Convention, asked questions which he said in his requisition, "it is now particularly important to the Militia of this state to have finally settled by the highest authority." The second question related solely to the duty of the Major Generals, constitutional officers equally with himself, and hence with constitutional duties of their own apart from his. In 1825, (3 Me. 484,) the Senate inquired whether one could at the same time constitutionally hold the offices of deputy sheriff and justice of the peace, or of sheriff and justice of the peace,—or of coroner and justice of the peace. Neither of these questions could concern the legislative department, but only the executive and judicial departments. They must have been asked for the benefit of the officers concerned, or of the people at large. In 1830, (6 Me. 514) the acting Governor inquired whether a convention of the two Houses could be formed without the formal concurrence of both branches, and whether such a convention could fill vacancies in the

Senate.    Clearly, this whole matter was entirely outside of Executive action.    Again, the same year (7 Me. 483,) Governor Huntoon, after he was seated, inquired as to the constitution of the Senate,—whether certain persons seated as Senators were constitutionally entitled to their seats.    That the Governor could not act in this matter is apparent.    In 1863, (52 Me. 594) occurred a conspicuous instance.    The Governor recited the practices of some towns in the State voting money for commutations for their citizens drafted into the U. S. military service, and that it was "feared by many good citizens that serious complications and embarrassments may result to the towns    .    .    .    .    as well as to individuals."    He therefore asked,—whether a town could pledge its credit or raise money by taxation for that purpose.    In this instance the Governor could have no official concern with the matter, and he asked the question avowedly for the sole benefit of towns and individuals.    In 1867, (55 Maine, 596) the two Houses required the Justices to prepare and send to the Secretary of State, not to the Houses, a schedule of legal taxable costs in various legal proceedings.    This was evidently for the information of litigants, and not for legislative action.    In 1872, (61 Maine, 601,) the Governor asked whether an election should be held in Penobscot county the following September for the Register of Probate.    The Governor could take no action in the premises, and inquired solely for the benefit of the people of that county.

In all the foregoing instances the Justices answered without objection or hesitation, which they clearly should not have done if the doctrine now advanced is sound.    Unless it was their duty to answer, it was their duty not to answer.    Another constant practice may be noted,—the publication and preservation of the questions and answers in the reports, as tending to show the understanding that they were for the benefit of the whole people rather than of the particular branch requiring the opinion.

III.    Leaving the general propositions and coming to the particular question now submitted, we understand the refusing Justices to concede that they are questions of law, that they are important, that they concern the House of Representatives and its member-

ship, and that if the House were still in session there would be sufficient occasion,—but that, inasmuch as the House asked the questions only two days before its final adjournment and adjourned before the questions reached the Justices, that particular House cannot act upon the answers, and hence the original sufficient occasion has disappeared. We understand them to finally base their refusal upon the fact that the House is not now in session. Indeed, they say in conclusion, that if the present House should be convened in extra session, they " would undoubtedly feel it our (their) duty to submit an opinion in answer to the questions in such season, that it could be made use of by the House." This concession eliminates from this case the two propositions above discussed, and narrows the issue to this:—Whether the duty to answer a question of law submitted by the House expires with the session at which the question was submitted.

Upon this issue the contention of the refusing Justices seems to be an entirely new doctrine now advanced for the very first time. We cannot find that it has ever before been even suggested in this, or any other State, in over a century of political life under the constitution. We do not find it disclosed in the language of the constitution. We do not find there any words requiring the House to submit its questions in the early days of its sessions, or limiting the obligation of the Justices to questions submitted in season for answers before adjournment.

Nor does it seem to us to be a necessary doctrine. This constitutional provision was adopted for the protection and benefit of the people. The power and jurisdiction conferred by it are to be exercised for the protection and benefit of the people, and so are the duties imposed by it. The House is merely one branch of the legislature, and the legislature and the legislative power are continuous. There is never an interregnum. There is always a House of Representatives though its members are changed bi-ennially. The change of membership does not change any of its constitutional powers and duties. These remain the same from session to session, nor are they to be exercised solely for the House itself or for the current session. The House exercises its powers for the

whole people, and for their future as well as present good.   It may also at one session provide for the information or convenience of the House at future sessions.   Its commands do not fall to the ground at the adjournment of each session, but stand good until repealed or until expiring by their own limitation.

In the administration of a constitutional government it may often be wise, and there may be even "solemn occasion," to anticipate possible problems and emergencies, and not wait until they are confronting.   The present solution of an important question of law in governmental matters may be necessary to prevent future troubles. Again, there may be an error or chance of error discovered now which should be avoided in the future.   In those governments where the constitution empowers the other branches to require the opinion of the Justices, a present opinion may be necessary for future use.   In such cases, the present, not the future, is the "solemn occasion."   A present opinion may furnish light for future action.   Some of the questions now before us seem to be of that nature.   When new members are sent to the House, almost their first duty will be to determine who are entitled to seats. The taking of the oath of office will occur on the first day of the new session and the effect of that oath should be then known.   An opinion obtained beforehand may be of some practical use, while one obtained after the event might be merely academic.   Again, it may be important to know now, whether certain offices are now vacant by reason of their incumbents taking seats in the House.

Referring to the practice upon this issue, we find no instance in any state where the Justices have refused to give their opinion because of the adjournment of the session,—and we do find instances where the opinions have been given notwithstanding such adjournment.   In 7 N. H. 599, the Justices responded the next year to the inquiry of the Senate.   In 8 N. H. 573, the requisition of the House was made June 20th, 1834, for an opinion whether aliens and persons over seventy years were rateable polls. The opinion was not given till the next year.   In 25 N. H. 537, the Justices returned their opinion to the President of the Senate after the adjournment.   In 41 N. H. 550, the Justices returned

their opinion to the House the next year after the requisition. In 9 Cush. 604, the opinion was sent to the President of the Senate in September, some time after the adjournment of the Senate. In 126 Mass. 557, the requisition was made in April and largely concerned parliamentary procedure, but the Justices took their time and did not return their opinion till Dec. 31, just before the organization of the legislature for the next year. In 7 Me. 497, the House upon the eve of its adjournment made requisition for an opinion as to electors and ballots. The Justices returned their opinion to the Governor and Council for publication after the adjournment of the House. In 44 Maine, 504, the Senate just before adjournment made requisition for an opinion whether persons of African descent could be electors. The opinion was sent to the Secretary of State after the adjournment of the Senate and was published by him. In 53 Maine, 594, the House, five days before adjournment, made requisition for an opinion as to whether a pending bill was in conflict with an Act of Congress. The opinion was not given until after the adjournment. In 55 Maine, 595, a legislative requisition for an opinion as to taxable costs in legal proceedings was not answered till long after the adjournment.

In some of the above instances the Senate or House making the requisition specially requested the opinion to be given after adjournment if it could not be prepared before,—but, if the doctrine of the refusing Justices is correct, this request had no constitutional force. The occasion still fell with the adjournment, and the Justices were not authorized to answer, for, as already said, it is their duty not to answer, unless they are obliged to answer. The mere request of the House, or Senate, would not authorize an answer not required by the constitution.

We have cited so many instances of actual practice antagonistic to the several doctrines assumed by the refusing Justices, because of the well known canon of legal interpretation expressed in the old common law maxim, " contemporanea expositio est optima et fortissima in lege," 2 Coke's Inst. 11, and in the older civil law maxim " optimus legis interpres est consuetudo." Dig. 1-3-37 (Paulus). The early practice under any constitutional provision is admittedly

of very great and even controlling force when such pratice does not conflict with the express words of such provision. It is well known as matter of history, that members of the convention drafting the constitution afterward became governors, legislators and judges under it. They best knew the scope and purpose of its provisions. The people who themselves voted upon the adoption of the constitution would more quickly notice any departure from its letter or spirit. If, therefore, we find a comparatively uniform practice under a constitutional provision by the earlier incumbents of office, acquiesced in by the persons or officers unfavorably affected by it, and not opposed to clear, express language of the constitution, such practice is a better, safer guide to the real meaning and scope of the provision, than any verbal, grammatical or even philosophical interpretation by subsequent generations in after-years. Broom's Legal Maxims, 658, 884; *Cohens* v. *Virginia*, 6 Wheat. 418; *Rhode Island* v. *Massachusetts*, 12 Pet. 657; *Rogers* v. *Goodwin*, 2 Mass. 475; Gray, C. J. in opinion of Justices, 126 Mass. 594.

In obedience to the constitution as thus authoritatively interpreted by the unvarying practice of more than a century, forty years in Massachusetts to the time of the Separation and then in Maine for seventy years more until 1891, we give our opinion upon the questions submitted, briefly as follows:—

I.   It is our opinion that the office of Fish and Game Commissioner and also the office of trustee of any state institution, where the appointments thereto are made by the Governor or Legislature, are state offices, and, so far as any compensation is affixed by law to those offices, are "offices of profit under this State," within § 11 of Art. 4 of the Constitution, prohibiting a person holding such offices from having a seat in either house of the legislature during his continuance in such office. Each of such persons wields some part of the power of the State, however small, and in some sphere of state action, however limited. They come within the definition of the term office given by the Justices in answer to the Governor's questions in 3 Maine, 481. Nor does it matter whether their compensation be large or small, by regular annual salary, by per diem-

pay for days actually employed, or by fees for each act of service. If there be any compensation allowed over and above sums allowed for expenses, the office is one of profit. An office is lucrative when any pay is attached. *State* v. *Kirk*, 44 Ind. 401. The following persons have been judicially determined to be holding office under the State, viz: A City Marshal, *Andrews* v. *King*, 77 Maine, 224; *Farrell* v. *Bridgeport*, 45 Conn. 191. A school trustee, *Chambers* v. *Barnard*, (Ind.) 11 L. R. A. 613. *Ogden* v. *Raymond*, 22 Conn. 379. The director of a State Prison, *Howard* v. *Shoemaker*, 35 Ind. 111. A State Commissioner to the U. S. Centennial Exposition, *In re Corliss*, 11 R. I. 638. Receiver of a National Bank (under U. S.) *Platt* v. *Beach*, 2 Benedict, 303. A trustee of a State University, *McCornick* v. *Pratt*, (Utah) 17 L. R. A. 243; *People* v. *Bledsoe*, 68 N. C. 457. Director of a State Asylum for the Deaf and Dumb, *People* v. *McKee*, 68 N. C. 429. *Dullam* v. *Wilson*, 53 Mich. 392. The medical superintendent of a State Hospital for the Insane, *State* v. *Wilson*, 29 Ohio St. 347. The Mayor of a City, *Attorney General* v. *Detroit*, 112 Mich. 145. A Trustee of the State Library, *People* v. *Sanderson*, 30 Cal. 160. A Park Commissioner, *Sherwood* v. *State Board of Canvassers*, (N. Y.) 11 L. R. A. 646. A State Detective, *Brown* v. *Russell*, 166 Mass. 14.

II. The Constitution, Art. 4, § 11, does not declare that the holder of an office of profit under the state shall not be elected to the legislature,—shall not be eligible to an election,—but simply declares that he shall not " have a seat in either house during his continuing in such office." Hence he need not resign his office before his election to the legislature. It is enough if he resigns it at the time of taking his seat in the legislature, and such resignation may only be by taking his oath or seat. The right of the electors to elect whom they will to any elective office is to be construed liberally, as abridged only by the express terms of the constitution or statute and not by mere implication. *Barker* v. *People*, 3 Cowen, 686. Thus, it has been judicially held that one who is an alien at the time of his election may yet take the office if he be

naturalized after his election. *State* v. *Murray*, 28 Wis. 96; *Per-ine* v. *Van Beek*, (Iowa) 19 L. R. A. 622; also that a statute declaring that certain classes of persons "shall not be eligible to the office of county commissioner," does not mean eligible to be elected, but only at the beginning of the term for which he was elected. *Demare* v. *Scates*, (Kan.) 30 L. R. A. 97. In *Common-wealth* v. *Hawkes*, 123 Mass. 525, it was judicially said after argument (p. 529–30) that "by the common law, when two offices or public trusts are incompatible with each other, a person holding the one is not disqualified to be appointed or elected to the other, but his acceptance of the second office is in law an implied resigna-tion of the first, whenever it may be resigned by the mere act of the incumbent, without the assent or concurrence of a superior authority." We think it has always been understood in New Eng-land that a resignation of a State office vacated the office without any action of acceptance. We do not find any case holding the contrary in the New England or federal courts. The Justices of Maine, in 70 Maine, 597, expressed the opinion that a person who had once resigned his seat in the legislature could not recall it although it had not been accepted. In McCrary on Elections, § 243, 2nd Ed. it is said that a formal resignation of an incompatible office is not necessary for admission to a seat in Congress. The taking the seat vacates the former office.

Mr. Cushing in his Law and Practice of Legislative Assemblies § 78 said: "Thus where it is said, no person holding a partic-ular office, etc., shall have a seat" etc., the disqualification relates to the time of assuming the functions of a member. In McCrary on Elections it is said § 258, 2nd. Ed. "it has been the constant practice of the Congress of the United States, since the Rebellion, to admit persons to seats in that body who were ineligible at the date of their election, but whose disabilities had been subsequently removed." The same doctrine was held in *Smith* v. *Moore* 90 Ind. 294.

Justices Sumner, Lincoln and Morton were respectively elected Governor of Massachusetts and accepted that office while holding the office of Justice of the Supreme Judicial Court. Their

right to take and hold the office of Governor was never questioned. *Com.* v *Hawkes* 123 Mass. 534. In this State, Hannibal Hamlin was elected Governor in September, 1856, while holding the office of U. S. Senator, and after his election as Governor he sat in the Senate and took part in its debates and votes until a few days before his inauguration as Governor. He was again elected U. S. Senator in January, 1857, while holding the office of Governor. His right to take either office to which he was elected was never questioned.

In answer to this second question, we do not forget that the House is by the constitution the exclusive "judge of the elections and qualifications of its own members," (Art. IV § 3) and can insist upon a prior formal resignation of an incompatible .office before admitting the holder to a seat in the House,—or can admit him without such resignation,—or can adjudge such officer wholly ineligible to a seat.

III. The third question we answer in the affirmative. It has been repeatedly held by the courts that an office-holder by accepting an incompatible office, thereby vacates the office first held,—vacates it as completely as by an accepted resignation. *Stubbs* v. *Lee*, 64 Maine, 195 and cases there cited; *Pooler* v. *Reed*, 73 Maine, 129 ; *State* v. *Brown*, 5 R. I. 1 ; *Commonwealth* v. *Hawkes*, 123 Mass. 525; *People* v. *Brooklyn*, 77 N. Y. 573; McCrary on Elections, § 243, (2nd Ed.); *Rex* v. *Hughes*, 5 B. and C. 886 ; *Milward* v. *Thatcher*, 2 T. R. 81. We have found no case to the contrary.

IV. The constitution in terms (Art 4, Part III, § 10) prohibits the appointment of a senator or representative, during the term for which he shall have been elected, to any civil office of profit under this State, which shall have been created or the emoluments of which increased during such term,—i. e. the term for which he was elected. As to such offices the appointment itself is prohibited, and the. prohibition continues, not only while the member retains his seat in the legislature, but continues until the expiration of the term for which he was elected. He cannot, therefore, be appointed

to such offices during that term, even though he has resigned his seat in the legislature. *In re Corliss*, 11 R. I. 638; *State* v. *Sutton*, (Minn.) 30 L. R. A. 630. It may be noted, however, that this prohibition does not include "such offices as may be filled by elections by the people." Art. 4, Part III, § 10.

As to other offices, not created nor their emoluments increased during the term for which the member was elected, we find no such prohibition. We think, therefore, a member of the present legislature can be appointed to such offices, including that of Fish and Game Commissioner, or trustee of a State Institution, during the term for which he was elected. We also think he can be so appointed without first resigning his seat in the legislature, for the reasons stated in the answer to the second question. If such appointee, however, accepts such office he thereby vacates his seat in the legislature whether it be in session or not. Vide reasons stated and cases cited in the answer to the third question. See also McCrary on Elections, § 238 et seq.

Believing the above to practically cover the questions propounded,

We are, Sirs, with great respect your obedient servants.

LUCILIUS A. EMERY,
WM. P. WHITEHOUSE,
HENRY C. PEABODY.

December 2, 1901.