2017 ME 100


OPINION OF THE JUSTICES
OF THE SUPREME JUDICIAL COURT

GIVEN UNDER THE PROVISIONS OF
ARTICLE VI, SECTION 3 OF THE MAINE CONSTITUTION

Docket No. OJ-17-1


_____


QUESTIONS PROPOUNDED BY
THE MAINE SENATE

IN A COMMUNICATION

DATED FEBRUARY 2, 2017

ARGUED APRIL 13, 2017

ANSWERED MAY 23, 2017


_____

## QUESTIONS PROPOUNDED BY THE MAINE SENATE
## IN A COMMUNICATION DATED FEBRUARY 2, 2017

**WHEREAS,** it appears to the Senate of the 128th Legislature that the following are important questions of law and that this is a solemn occasion; and

**WHEREAS,** the Constitution of Maine, Article VI, Section 3 provides for the Justices of the Supreme Judicial Court to render their opinion on such questions; and

**WHEREAS,** separate provisions of the Constitution of Maine, adopted at different times, provide that persons elected to the House of Representatives and as Governor shall be elected "by a plurality of all votes returned," Me. Const. art. IV, pt. 1, §5 and art. V, pt. 1, §3, and those elected to the Senate "by a plurality of the votes in each senatorial district," Me. Const. art. IV, pt. 2, §4; and

**WHEREAS,** Article IV, Part First, Section 5 of the Constitution of Maine provides that in elections for the House of Representatives, "the election officials of the various towns and cities shall ... receive the votes of all the qualified electors, sort, count and declare them in open meeting; and a list of the persons voted for shall be formed, with the number of votes for each person against that person's name. ... Fair copies of the lists of votes shall be attested by the municipal officers and the clerks of the cities and towns [who] shall cause the same to be delivered into the office of the Secretary of State forthwith ... [and] [t]he Governor shall examine the returned copies of such lists and ... shall issue a summons to such persons as shall appear to have been elected by a plurality of all votes returned, to attend and take their seats."; and

**WHEREAS,** Article IV, Part Second, Section 3 of the Constitution of Maine provides that meetings for the election of Senators "shall be notified, held and regulated and the votes received, sorted, counted, declared and recorded, in the same manner as those for Representatives.  Fair copies of the lists of votes shall be attested by the clerks of the cities and towns or other duly authorized officials and sealed up in open meetings and ... delivered into the office of the Secretary of State forthwith."; and Article IV, Part Second, Section 4 further provides that "[t]he Governor shall ... examine the copies of such lists, and ... issue a summons to such persons, as shall appear to be elected by a plurality of

the votes in each senatorial district, to attend that day and take their seats.”; and

**WHEREAS,** Article V, Part First, Section 3 of the Constitution of Maine provides that “meetings for election of Governor shall be notified, held and regulated and votes shall be received, sorted, counted and declared and recorded, in the same manner as those for Senators and Representatives. Copies of lists of votes shall be sealed and returned to the secretary’s office in the same manner and at the same time as those for Senators.  The Secretary of State ... shall ... lay the lists returned to the secretary’s office before the Senate and House of Representatives to be by them examined, ... and they shall determine the number of votes duly cast for the office of Governor, and in case of a choice by plurality of all of the votes returned they shall declare and publish the same.”; and

**WHEREAS,** Article V, Part First, Section 3 of the Constitution of Maine further provides that “[i]f there shall be a tie between the 2 persons having the largest number of votes for Governor, the House of Representatives and the Senate meeting in joint session, and each member of said bodies having a single vote, shall elect one of said 2 persons having so received an equal number of votes and the person so elected by the Senate and House of Representatives shall be declared the Governor.”; and

**WHEREAS,** on November 8, 2016, the voters of the state approved a measure referred to the people pursuant to Article IV, Part Third, Section 18 of the Constitution of Maine, entitled An Act To Establish Ranked-choice Voting, referred to in this order as “the Act,” which creates new methods of casting ballots for candidates, counting votes and determining elections for the offices of Governor, State Senator and State Representative, as well as the offices of United States Senator and Representative to Congress, and applies to elections held on or after January 1, 2018; and

**WHEREAS,** section 2 of the Act defines “ranked-choice voting” as “the method of casting and tabulating votes in which voters rank candidates in order of preference, tabulation proceeds in sequential rounds in which last-place candidates are defeated and the candidate with the most votes in the final round is elected”; and

4

**WHEREAS,** the Act provides that "[f]or offices elected by ranked-choice voting, the Secretary of State shall tabulate the votes according to the ranked-choice voting method described in [the Maine Revised Statutes, Title 21-A,] section 723-A" as enacted by section 5 of the Act; and

**WHEREAS,** the method of ranked-choice voting described in the Act does not allow the Secretary of State to aggregate the lists of votes compiled by city and town officials and submitted to the Secretary as required by the Constitution of Maine as set forth above, but instead necessitates that all ballots or images of ballots cast by voters within the entire electoral district be delivered to a central location in order for the Secretary of State to conduct multiple rounds of counting and redistributing voter preferences in each subsequent round of counting using specially designed computer software; and

**WHEREAS,** the Attorney General issued an opinion on March 4, 2016, to the effect that the system of ranked-choice voting established in the Act conflicts with provisions of Article IV, Part First, Section 5; Article IV, Part Second, Sections 3 and 4; and Article V, Part First, Section 3 of the Constitution of Maine, which declare that ballots are to be counted by municipal officials and that the winner of each electoral race is the candidate who received a plurality of the votes cast and counted at the municipal level, and further that the ranked-choice method of resolving a tie vote in a race for Governor conflicts with Article V, Part First, Section 3; and

**WHEREAS,** the Act appears to conflict with the Constitution of Maine inasmuch as it would not recognize a person obtaining a plurality of the votes counted and declared by city and town officials as having prevailed in the election; would fundamentally change the role of city and town officials in sorting, counting, declaring and recording votes and would transfer those duties to the Secretary of State; and would eliminate the role of the House of Representatives and the Senate in resolving tie votes for the office of Governor; and

**WHEREAS,** the Act's provision for resolving tie votes for Governor by lot conflicts with duties that the Constitution of Maine imposes on Representatives and Senators under such circumstances pursuant to Article V, Part First, Section 3 and, therefore, would require them to violate their oath of office pursuant to Article IX, Section 1 of the Constitution of Maine; and

**WHEREAS,** if the Act were applied to elections in 2018 without resolution of the constitutional questions presented here, a candidate for Representative, Senate or Governor who gained a plurality of the votes counted by city and town officials but failed to prevail in the subsequent round or rounds counted centrally by the Secretary of State pursuant to the Act could challenge that candidate's declared loss as violative of the plurality vote requirement in the Constitution of Maine for the position sought by that candidate, and thereby place the validity of the election into question and delay the seating of a Representative, Senator or Governor; and

**WHEREAS,** failing to address important and unresolved questions of law about the constitutionality of ranked-choice voting before the end of the current legislative session would create uncertainty over the outcome of any future election contests involving more than 2 candidates; and

**WHEREAS,** the Senate requests guidance from the Justices as to the constitutionality of the Act so that it may determine, during the current legislative session, whether it is necessary to propose constitutional amendments for submission to the voters for approval in November 2017, in order to implement ranked-choice voting for elections held on or after January 1, 2018, as the Act requires; and

**WHEREAS,** the 128th Legislature also must determine during the current legislative session whether to authorize and appropriate in excess of $1,500,000 in the biennial budget for the period beginning July 1, 2017 to implement the Act, including funds at a minimum for new voting equipment and computer software, staff positions, ballot printing and transportation and storage of ballots for counting in a central location; and

**WHEREAS,** it is vital that the Senate be informed during the current legislative session as to the opinions of the Justices on the questions propounded in this order; now, therefore, be it

**ORDERED,** that, in accordance with the provisions of the Constitution of Maine, the Senate respectfully requests the Justices of the Supreme Judicial Court to give the Senate their opinion on the following questions of law:

6

Question 1. Does the Act's requirement that the Secretary of State count the votes centrally in multiple rounds conflict with the provisions of the Constitution of Maine that require that the city and town officials sort, count, declare and record the votes in elections for Representative, Senator and Governor as provided in the Constitution of Maine, Article IV, Part First, Section 5, Article IV, Part Second, Section 3 and Article V, Part First, Section 3?

Question 2. Does the method of ranked-choice voting established by the Act in elections for Representative, Senator and Governor violate the provisions of the Constitution of Maine, Article IV, Part First, Section 5, Article IV, Part Second, Sections 3 and 4 and Article V, Part First, Section 3, respectively, which declare that the person elected shall be the candidate who receives a plurality of all the votes counted and declared by city and town officials as recorded on lists returned to the Secretary of State?

Question 3. Does the requirement in the Act that a tie between candidates for Governor in the final round of counting be decided by lot conflict with the provisions of the Constitution of Maine, Article V, Part First, Section 3 relating to resolution of a tie vote for Governor by the House of Representatives and Senate?

**SPONSORED BY:** /s/ Michael Thibodeau

Senate President
128th Maine Legislature

OPINION OF THE JUSTICES

To the Maine Senate:

[¶1] By communication dated February 2, 2017, the Maine Senate propounded three Questions to us as individual Justices of the Maine Supreme Judicial Court pursuant article VI, section 3 of the Maine Constitution, which states, "The Justices of the Supreme Judicial Court shall be obliged to give their opinion upon important questions of law, and upon solemn occasions, when required by the Governor, Senate or House of Representatives." Me. Const. art. VI, § 3; *see Opinion of the Justices*, 682 A.2d 661, 663 (Me. 1996).

[¶2] It is our honor to provide the following response. All seven Justices agree with the Opinion set forth herein.

## I. BACKGROUND

[¶3] The Senate seeks our opinions regarding the constitutionality of a statute recently enacted through citizen initiative, L.D. 1557, §§ 1-6 (referred to the voters, 127th Legis. 2016) (effective Jan. 7, 2017) (to be codified at 21-A M.R.S. §§ 1(27-C), 1(35-A), 601(2)(J), 722(1), 723-A (2017)),[1] which established ranked-choice voting for elections of United States Senators, United States Representatives, Governor, State Senators, State Representatives, and

---

[1] L.D. 1557 (referred to the voters, 127th Legis. 2016) (effective Jan. 7, 2017) (to be codified at 21-A M.R.S. §§ 1(27-C), 1(35-A) 601(2)(J), 722(1), 723-A (2017)) is reproduced in Appendix B.

8

federal and state primaries in Maine occurring on or after January 1, 2018.[2] 21-A M.R.S. § 1(27-C); L.D. 1557, §§ 1, 6.

[¶4] The term "ranked-choice voting" is defined by the newly enacted Act as "the method of casting and tabulating votes in which voters rank candidates in order of preference, tabulation proceeds in sequential rounds in which last-place candidates are defeated and the candidate with the most votes in the final round is elected." 21-A M.R.S. § 1(35-A); L.D. 1557, § 2. As defined, ranked-choice voting contrasts with the statutory description of Maine's previous system of single-choice voting, by which voters voted for a single candidate for each seat. *See* 21-A M.R.S. §§ 691, 692, 723 (2016). The crux of the Senate's inquiry is whether this statutorily enacted system of ranked-choice voting violates the provisions of the Maine Constitution by which successful candidates for office are identified "by a plurality" of all votes returned, namely, Me. Const. art. IV, pt. 1, § 5 (regarding the election of State Representatives); Me. Const. art. IV, pt. 2, § 4 (regarding the election of State Senators); and Me. Const. art. V, pt. 1, § 3 (regarding the election of the Governor).[3]

---

[2] As enacted, L.D. 1557 was entitled, "An Act to Establish Ranked-choice Voting." For ease of discussion, we refer to it as the "Ranked-Choice Voting Act" or "the Act."

[3] The Senate asks two additional questions—whether the Ranked-Choice Voting Act violates those portions of the Maine Constitution that dictate how votes are sorted, counted, and declared in municipalities, *see* Me. Const. art. IV, pt. 1, § 5; Me. Const. art. IV, pt. 2, § 3; Me. Const. art. V, pt. 1, § 3, and whether the Act violates the constitutional provision regarding a tie vote in a gubernatorial

[¶5]   We invited briefs from the Maine Senate and other interested persons and entities.   We received briefs from the Maine Senate; the Maine House Republican Caucus and the Maine Heritage Policy Center; the Secretary of State; the Attorney General; Maine Senators Troy Jackson, Mark Dion, Shenna Bellows, Ben Chipman, Justin Chenette, Rebecca Millett, David Miramant, and Eloise Vitelli; the League of Women Voters of Maine and Maine Citizens for Clean Elections; Marshall J. Tinkle, Esq.; the Committee for Ranked Choice Voting; FairVote; Dmitry Bam; and Larry Diamond.[4]   We conducted an Oral Argument on the Questions on April 13, 2017.

## II.  DISCUSSION

[¶6]   We begin our consideration of the Questions presented by noting that *only* the question of the constitutionality of the Ranked-Choice Voting Act is presented to us.   The public policy of ranked-choice voting, including the benefits and detriments of such a voting procedure, is squarely outside our consideration.   Such matters instead rest in the capable hands of the voters of the State of Maine, the Maine Legislature, and the Governor.   *See City of Belfast v. Belfast Water Co.*, 115 Me. 234, 241, 98 A. 738 (1916); *Moulton v. Scully*,

---

election, *see* Me. Const. art. V, pt. 1, § 3.   Those questions are secondary to the primary issue of plurality.

  [4]  Appendix A contains a summary of the positions taken in each brief.

111 Me. 428, 448, 89 A. 944 (1914) ("The design was to have the legislative power not final but subject to the will of the people . . . .").

[¶7]  We are asked to opine on whether the Ranked-Choice Voting Act violates the Maine Constitution in any of three respects.  It is the Maine Constitution that provides for the citizen-initiative process by which the people vote directly on proposed legislation.  Me. Const. art. IV, pt. 3, § 18; *see* 21-A M.R.S. §§ 901-906 (2016); *League of Women Voters v. Sec'y of State*, 683 A.2d 769, 771 (Me. 1996).  It important to note that the Maine Constitution, citizen-enacted legislation, and legislatively enacted legislation reflect the will of the people.  *See Moulton*, 111 Me. at 463, 89 A. 944 (Haley, J., dissenting).  The object must always be to "ascertain the will of the people."  *Lewis v. Webb*, 3 Me. 326, 337 (1825).

[¶8]  Nonetheless, when a statute—including one enacted by citizen initiative—conflicts with a constitutional provision, the Constitution prevails.  *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177-80 (1803).  It is "supposed to be essential to all written constitutions, that a law repugnant to the constitution is void."  *Id.* at 180; *see League of Women Voters*, 683 A.2d at 771-72; *Allen v. Inhabitants of Jay*, 60 Me. 124, 138 (1872) ("A statute in direct violation of the essential principles of justice, is not the law of the land within the meaning of

the [C]onstitution." (quotation marks omitted)).  Thus, as is required, the result of any opinion or declaration that a statute is unconstitutional is the elevation of the will of the people as expressed in the Constitution above that as expressed in a statute.  *See Marbury*, 5 U.S. (1 Cranch) at 180.

A.     Authority to Issue Advisory Opinions

[¶9]  Advisory Opinions represent the advice of the individual Justices. Me. Const. art. VI, § 3; *Opinion of the Justices*, 682 A.2d at 663.  They are not binding on the Justices individually or together in any subsequent case that may come before the Law Court and they have no precedential value or conclusive effect.  *Opinion of the Justices*, 682 A.2d at 663; *see Opinion of the Justices*, 281 A.2d 321, 322 (Me. 1971) ("The rule of stare decisis does not apply to Justices' Constitutional Advisory Opinions.").  An Advisory Opinion of the Justices, however, provides guidance and legal analysis that is "required" by the other Branches for their use in decision-making and action.  Me. Const. art. VI, § 3.  Such advice must be cautiously and sparingly given.

[¶10]  Before the Justices may consider the Questions propounded by the Senate, "it is first their constitutional duty to investigate with care whether in the given situation the Constitution denies them the right to answer the questions propounded."  *Opinion of the Justices*, 396 A.2d 219, 223 (Me. 1979).

12

This threshold inquiry is critical to the interactions of the three Branches, both because the Justices are constrained by strict constitutional limitations on their authority to issue Advisory Opinions and because any violation of those constraints implicates our government's tripartite structure. To assure clarity, we address these concepts in detail.

1.  Foundational Limitations on Judicial Intervention

[¶11]  In the normal course, the Justices of the Supreme Judicial Court exercise great care to avoid issuing Advisory Opinions based on two "overriding principles binding upon the judiciary"—the separation of powers doctrine and the requirement of a live case or controversy. *Id.* Because the authority of the Justices to author constitutionally allowed Advisory Opinions is a narrow exception to those principles, we think it necessary to address them here.

a.  Separation of Powers

[¶12]  The Maine Constitution divides the "powers of government" into three Branches: the Legislative Branch, the Executive Branch, and the Judicial Branch. Me. Const. art. III, § 1.[5] "No person or persons, belonging to one of these

---

[5]  Although, at the time of the enactment of the Maine Constitution, the three Branches were referred to as "departments," Me. Const. art. III, § 1 (1820), that nomenclature has evolved over time, in great part because the Executive Branch itself is now divided into many "departments." To avoid

[Branches], shall exercise any of the powers properly belonging to either of the others, except in the cases herein expressly directed or permitted." Me. Const. art. III, § 2; *see Opinion of the Justices*, 2002 ME 169, ¶ 4, 815 A.2d 791.

[¶13]  The separation of powers doctrine thereby prohibits any of the three Branches of government from exercising the powers relegated to either of the other two Branches.  Me. Const. art. III, § 2; *see Bar Harbor Banking & Tr. Co. v. Alexander*, 411 A.2d 74, 77 (Me. 1980) ("The constitutionally mandated separation of powers forbids precipitous injunctive interference with the legitimate, ongoing [function of another Branch of government].").  Separation of powers is similarly reflected in the United States Constitution.  *See Marbury*, 5 U.S. (1 Cranch) at 176-80; *see also O'Donoghue v. United States*, 289 U.S. 516, 530 (1933); *Myers v. United States*, 272 U.S. 52, 293 (1926) (Brandeis, J., dissenting) (stating that the object of the separation of powers doctrine is, "by means of the inevitable friction incident to the distribution of the governmental powers among three departments, to save the people from autocracy").

[¶14]  Thus, in the absence of direct constitutional authorization to provide Advisory Opinions, the doctrine of separation of powers dictates that "we decline to answer questions presented by the Governor or the Legislature

---

confusion, we refer to the executive, legislative, and judicial components of government as "Branches."

14

regarding their respective authority." *Opinion of the Justices*, 2002 ME 169, ¶ 4, 815 A.2d 791.

> b.      Case or Controversy Requirement

[¶15]   The second important principle limiting the authority of the Justices is the "universal rule [that] judicial power may be exercised only in an actual case and controversy." *Opinion of the Justices*, 396 A.2d at 223. "A justiciable case or controversy involves a claim of present and fixed rights, as opposed to hypothetical or future rights, asserted by one party against another who has an interest in contesting the claim." *Hathaway v. City of Portland*, 2004 ME 47, ¶ 11, 845 A.2d 1168 (quotation marks omitted). Again, in the absence of constitutional authorization, the requirement of an actual case or controversy prohibits the issuance of an Advisory Opinion.[6]

2.      Express Constitutional Prerequisites to Advisory Opinions

[¶16]  Providing a narrow exception to these core concepts attendant to the exercise of judicial power, the Maine Constitution, in article VI, section 3, carves out a single exception by which each Justice of the Supreme Judicial

---

[6] For example, the Questions propounded here are distinguished from those in *League of Women Voters v. Secretary of State*, 683 A.2d 769, 770-71 (Me. 1996), which regarded the enacted citizen initiative that imposed term limits on the members of the Maine Legislature. In that case, unlike here, the Court reviewed the constitutionality of the term limits statute in the context of an actual case or controversy rather than a request for an Advisory Opinion. *Id.*

Court may offer a judicial opinion in the absence of a live case or controversy, and in tension with the usual application of the separation of powers doctrine: "The Justices of the Supreme Judicial Court shall be obliged to give their opinion upon important questions of law, and upon solemn occasions, when required by the Governor, Senate or House of Representatives."[7]  Me. Const. art. VI, § 3; *see Opinion of the Justices*, 355 A.2d 341, 388 (Me. 1976); *Opinion of the Justices*, 396 A.2d at 223.  It is, therefore, "manifestly inappropriate for the Justices of the Supreme Judicial Court to express an opinion on an important question of law, with the single exception plainly stated in Article VI, Section 3, until the issue arises in the course of an adversary proceeding."  *Opinion of the Justices*, 355 A.2d at 388.

[¶17]  Because an Advisory Opinion represents a unique exception to such foundational principles, the Maine Constitution carefully cabins the authority of the Justices to provide an Advisory Opinion.  The tension between the constitutionally required separation of powers and the constitutionally provided authority of the Justices of the Maine Supreme Judicial Court to provide

---

[7]  Only a handful of states have constitutions that expressly provide or allow for the highest court of the state to issue Advisory Opinions.  *See, e.g.*, Colo. Const. art. VI, § 3; Fla. Const. art. IV, § 1(c); Mass. Const. pt. 2, ch. III, art. II; Mich. Const. art. III, § 8; N.H. Const. pt. 2, art. 74; R.I. Const. art. X, § 3; S.D. Const. art. V, § 5; *cf.* U.S. Const. art. III, § 2, cl. 1 (limiting federal court jurisdiction to cases and controversies).  In some other states, Advisory Opinions may be issued pursuant to statute or precedent.  *See, e.g.*, Ala. Code § 12-2-10 (LEXIS through May 16, 2017); Del. Code Ann. tit. 10, § 141(a) (LEXIS through 81 Del. Laws, ch. 15); *Mosely v. State*, 908 N.E.2d 599, 603 (Ind. 2009).

official but nonbinding advice to the other Branches is addressed through the balance articulated in the requirements (1) setting out who may seek the Justices' advice, (2) inquiring whether that advice is sought as to important questions of law, and (3) providing that a solemn occasion must exist for the Justices' provision of such advice. Me. Const. art. VI, § 3. These boundaries on the authority of the Justices "must be strictly observed." *Opinion of the Justices*, 437 A.2d 597, 610 (Me. 1981) (quotation marks omitted).

[¶18] We address in turn these express constitutional prerequisites to our authority to provide an Advisory Opinion to another Branch of government in the absence of a case or controversy.

a. Standing

[¶19] By express constitutional mandate, the Justices may consider issuing an Advisory Opinion only when requested by the Governor, or by the Maine Senate or the Maine House of Representatives. Me. Const. art. VI, § 3; *see Opinion of the Justices*, 2015 ME 27, ¶ 17, 112 A.3d 926.

b. Important Question of Law

[¶20] Perhaps because the Governor and the Houses of the Legislature are unlikely to seek an Advisory Opinion of the Justices in the absence of an important question of law, there is little jurisprudence directly setting out the

parameters of those occasions. We interpret the "important questions of law" requirement to mean that questions that are of little or no consequence, esoteric, or purely academic are not properly considered in an Advisory Opinion. Me. Const. art. VI § 3; *see Opinion of the Justices*, 571 A.2d 805, 810 (Me. 1989). Given the nature of the Questions before us today, we do not further address the jurisprudential descriptions of this prerequisite to exercising our Advisory Opinion authority.

c.  Solemn Occasion

[¶21] Determining the existence of a solemn occasion has, in contrast, presented a substantial challenge for the Justices throughout the years. Not surprisingly, during the almost two hundred years since the adoption of the Maine Constitution, the interpretation of the phrase "solemn occasions" within the meaning of article VI, section 3, has evolved. Over time, however, several guideposts have emerged to inform the Justices' exercise of their constitutionally provided authority to offer non-binding advice. These guideposts are judge-made parameters, not articulated in the Constitution. They each spring from a judicial effort to assure that we do not overstep our bounds with an unconstitutional foray into the clearly defined territory of the Legislative or Executive Branch.

### i. Unusual Exigency

[¶22]  We have determined that a solemn occasion is one that "arises when questions are of a serious and immediate nature, and the situation presents an unusual exigency."[8]  There must, in other words, be some urgency that requires the Justices to provide advice to the other Branches.  This aspect of the solemn occasion analysis is similar to the next element—that the issue be one of live gravity—but is subtly distinct in that it also addresses the requirement of a serious and unusual situation and infuses an element of temporal consideration.

### ii. Live Gravity

[¶23]  The question presented must be one of "live gravity," that is, one "of instant, not past nor future, concern."[9]  The live gravity requirement precludes us from providing advice that "would relate to matters merely tentative, hypothetical and abstract."[10]  The questioning Branch must be faced with the current need to act.[11]  For example, we declined to answer questions propounded by the House regarding the Governor's authority to override a veto

---

[8]  *Opinion of the Justices*, 2015 ME 107, ¶ 5, 123 A.3d 494 (quotation marks omitted).

[9]  *Opinion of the Justices*, 229 A.2d 829, 831 (Me. 1967) (quotation marks omitted).

[10]  *Opinion of the Justices*, 371 A.2d 616, 620 (Me. 1977) (quotation marks omitted).

[11]  *Opinion of the Justices*, 229 A.2d at 830.

when the Governor had not yet purported to veto any legislation.[12]  Similarly, we have declined to answer when the questioning body adjourned and therefore was unable to receive the answer[13] and when the proposed legislation at issue had already expired and was therefore no longer before the Legislature for consideration.[14]  To do so "would be an unwarrantable interference with the duties and functions of such future [Legislature or Governor]."[15]

### iii.    A Branch Must Ask for Itself

[¶24]  A questioning entity may not seek an Advisory Opinion relating to the power, duty, or authority of another Branch of government because the body presenting the question has no ability to act in response to the Advisory Opinion.[16] We will therefore decline to answer a question when one Branch of

---

[12]  *Id.* at 829-30 ("The form in which the question is presented to us does not indicate that your Honorable body is currently faced with the question."); *see Opinion of the Justices*, 2015 ME 27, ¶ 26, 112 A.3d 926 (declining to answer a question regarding an event that had not yet occurred).

[13]  *Opinion of the Justices*, 281 A.2d 321, 324 (Me. 1971); *see Opinion of the Justices*, 484 A.2d 999, 1002 (Me. 1984).

[14]  *Opinion of the Justices*, 674 A.2d 501, 502 (Me. 1996).

[15]  *Answer of the Justices*, 95 Me. 564, 571, 51 A. 224 (1901).

[16]  *Opinion of the Justices*, 709 A.2d 1183, 1185-86 (Me. 1997).

20

government seeks our advice regarding the authority of another Branch to undertake an action.[17]

### iv.    Not Tentative, Hypothetical, or Remote

[¶25]    Questions that "relate to matters merely tentative [or] hypothetical" present no solemn occasion.[18]  Similarly, the question cannot be based on a contingency "so extremely remote that it need hardly be taken into consideration."[19]

### v.    Specific and Limited

[¶26]  The questions presented must be "sufficiently precise that we can determine the exact nature of the inquiry."[20]  The Justices must understand from the question presented what provisions of law they are being asked to examine.[21]  Abstract or generalized questions about the constitutionality of a provision pursuant to the Maine or United States Constitution are not

---

[17] *Opinion of the Justices*, 460 A.2d 1341, 1349 (Me 1982) ("We must decline to answer Questions 6 and 7.  In both, the Governor inquires as to the powers of the Legislature."); *Opinion of the Justices*, 396 A.2d 219, 224 (Me. 1979).

[18] *Opinion of the Justices*, 371 A.2d at 620 (quotation marks omitted).

[19] *Answer of the Justices*, 95 Me. at 571-72, 51 A. 224.

[20] *Opinion of the Justices*, 2002 ME 169, ¶ 6, 815 A.2d 791 (quotation marks omitted).

[21] *Opinion of the Justices*, 460 A.2d at 1345-46.

appropriate subjects for an Advisory Opinion.[22] The question also must be based on clear and compelling facts as established only in the order or record provided by the questioning body; otherwise, the question implicates too broad a range of potential factual and legal possibilities.[23] Justices will decline to answer questions when their resolution involves the determination of facts and the application of other provisions of law beyond those that have generated the inquiry.[24]

vi.    Not Overly Complex

[¶27] Similarly, the Justices do not answer questions that are too complex to be answered in the absence of a case or controversy. In one matter, for example, the Justices opined, "The questions presented here require an analysis of intersecting laws, constitutional provisions, and facts. The complexity of the varying considerations renders it impossible for us to be confident of the law and other circumstances to such a degree as to leave no room for reasonable doubt."[25]

---

[22] *Opinion of the Justices*, 2012 ME 49, ¶ 9, 40 A.3d 930; *Opinion of the Justices*, 371 A.2d at 620; *Opinion of the Justices*, 155 Me. 141, 150, 152 A.2d 173 (1959).

[23] *Opinion of the Justices*, 2015 ME 107, ¶¶ 5-6, 123 A.3d 494; *Opinion of the Justices*, 2012 ME 49, ¶¶ 5, 9 & n.1, 40 A.3d 930.

[24] *Opinion of the Justices*, 460 A.2d at 1345.

[25] *Opinion of the Justices*, 2004 ME 54, ¶ 41, 850 A.2d 1145 (quotation marks omitted).

22

### vii. Not Subject to the Tug of Litigation

[¶28]  The question presented must be a matter applicable to the general public rather than private parties; it is "inexpedient to prejudice the question before any occasion has arisen calling for its legal determination."[26]  Similarly, the question presents no solemn occasion when it inquires whether the Law Court will overrule a prior decision.[27]

### viii. Doubt as to the Body's Authority

[¶29]  A question presents a solemn occasion when the questioning body—the House, the Senate, or the Governor—"has serious doubts" as to its own authority to take some action pursuant to the Maine Constitution or existing statutes.[28]  Exemplifying this principle, we have provided Advisory Opinions when the House, Senate, or Governor seeks an opinion as to the constitutionality of legislation currently pending before that body because, in

---

[26] *Answer of the Justices*, 85 Me. 545, 546, 27 A. 454 (1891); *see Opinion of the Justices*, 396 A.2d at 225; *Answer of the Justices*, 95 Me. at 566, 569, 51 A. 224.

[27] *Opinion of the Justices*, 157 Me. 152, 157-61, 170 A.2d 652 (1961).

[28] *Opinion of the Justices*, 2012 ME 49, ¶ 6, 40 A.3d 930; *see Opinion of the Justices*, 2015 ME 107, ¶ 8, 123 A.3d 494; *Opinion of the Justices*, 2015 ME 27, ¶ 18, 112 A.3d 926; *Opinion of the Justices*, 2002 ME 169, ¶ 11, 815 A.2d 791; *Opinion of the Justices*, 709 A.2d at 1185; *Answer of the Justices*, 95 Me. at 566-67, 51 A. 224.

those instances, the questioner seeks our guidance in determining its authority to approve the pending bill.[29]

### ix.    Status of the Law in Question

[¶30]   In combination, the requirements above often will preclude us from issuing an Advisory Opinion as to the constitutionality of an existing statute, both because the questioning body is not uncertain about its authority to act as to existing law and because existing law presents nothing pending that requires immediate action.[30]   In most instances, a challenge to the constitutionality of an existing law will be presented in the traditional context of a cause of action in a case or controversy where the statute has been applied to a dispute between or among specific parties.

---

[29] *See, e.g.*, *Opinion of the Justices*, 437 A.2d 597, 604-05 (Me. 1981) ("[The bill] has therefore not yet become law; it is still awaiting the Governor's signature; and whether he may constitutionally sign it into law is a question of live gravity on which he may require the Justices' opinions." (quotation marks omitted)); *see also Opinion of the Justices*, 560 A.2d 552, 555-56 (Me. 1989); *Opinion of the Justices*, 501 A.2d 16, 16, 20 (Me. 1985); *Opinion of the Justices*, 152 Me. 449, 449, 453, 132 A.2d 440 (1957).  Because it is not presented in this matter, we need not address the concern that when the questioner seeks an Advisory Opinion on the constitutionality of pending legislation in order to decide whether to act favorably on the legislation, the questioner is not actually asking about the body's *authority*, but is asking about the wisdom of a particular action.

[30] *See Opinion of the Justices*, 371 A.2d at 620; *Opinion of the Justices*, 355 A.2d 341, 390 (Me. 1976); *Opinion of the Justices*, 339 A.2d 483, 488 (Me. 1975) (declining to interpret existing law because the answer "would not in any way affect the power of the [questioner] to repeal these sections, or to amend them, or declare the meaning of them" (quotation marks omitted)); *Opinion of the Justices*, 153 Me. 216, 219-20, 136 A.2d 508 (1957); *Answers of the Justices*, 135 Me. 519, 519, 522, 191 A. 485 (1936).

24

[¶31] In this context, we have also noted that a statute could be amended before a case or controversy presents itself, or even while the request for an Advisory Opinion is pending, and that "[s]uch an amendment would have the force of law," unlike an Advisory Opinion.[31] Moreover, we act with caution because "an Advisory Opinion interpreting an existing statute, though not having the force of law, may jeopardize private rights and public interests created by such statute."[32]

B.     Application of Limits on Advisory Opinion Authority to Questions Presented

[¶32] With this analytical framework in mind, we examine the Questions presented to determine whether each Question originated from the Senate, the House, or the Governor and meets the criteria of presenting an important question of law upon a solemn occasion such that we are "required" to provide the advice sought by the Senate. Me. Const. art. VI, § 3; *see Opinion of the Justices*, 2015 ME 107, ¶ 4, 123 A.3d 494 (requiring an analysis of "each Question").

---

[31] *See Opinion of the Justices*, 396 A.2d at 225.

[32] *Id.*

1.     Question 2: Plurality Vote

[¶33] Because it is at the heart of the Questions presented, we first consider the second Question propounded, which addresses the Constitution's requirement of a plurality vote:

> Question 2: Does the method of ranked-choice voting established by the Act in elections for Representative, Senator and Governor violate the provisions of the Constitution of Maine, Article IV, Part First, Section 5, Article IV, Part Second, Sections 3 and 4 and Article V, Part First, Section 3, respectively, which declare that the person elected shall be the candidate who receives a plurality of all the votes counted and declared by city and town officials as recorded on lists returned to the Secretary of State?

[¶34] The Ranked-Choice Voting Act provides for tabulation in rounds. 21-A M.R.S. §§ 722(1), 723-A(2); L.D. 1557, §§ 4-5. If there are only two candidates, the candidate with the most votes wins and that candidate will necessarily win by a majority. 21-A M.R.S. § 723-A(2)(A); L.D. 1557, § 5. If, however, there are more than two candidates, upon completion of the first round of tabulation, and unless one candidate has received a mathematical majority of the votes, the candidate with the fewest votes is eliminated and a new round begins in which all votes cast for the eliminated candidate are reviewed and redistributed—this time to account for those voters' second-place choices. 21-A M.R.S. § 723-A(2)(B); L.D. 1557, § 5. Successive rounds become unnecessary when the candidate with the most votes has a majority of

votes or all ballots have been exhausted.  21-A M.R.S. § 723-A(1)(G); L.D. 1557, § 5.

[¶35]  The Senate asks whether the Act—by requiring successive rounds of counting even after one candidate has received a plurality of the votes and by eliminating candidates in successive rounds until only one candidate prevails—in fact violates the provisions of the Maine Constitution that require only a plurality.  Pursuant to Me. Const. art. IV, pt. 1, § 5, the election of State Representatives is accomplished "by a plurality of all votes returned"; pursuant to Me. Const. art. IV, pt. 2, § 4, State Senators are elected by "a plurality of the votes in each senatorial district"; and pursuant to Me. Const. art. V, pt. 1, § 3, the Governor is elected "by plurality of all of the votes returned."  Before we may consider these substantive questions, we apply the law that we have just described regarding the constitutional limitations on our authority to provide an Advisory Opinion.

a.      Standing

[¶36]  The Senate has presented the Questions to us.  Therefore, the standing requirement of the Maine Constitution has been met with regard to Question 2.

b.    Important Question of Law

[¶37]  There can be no doubt that Question 2 addresses a very serious matter, or that the change effectuated by the citizen initiative is extensive in enacting a new and comprehensively different method of voting for all major State offices.  Whether the Act conflicts with the constitutional "plurality" requirement is a question of serious consequence for the people of this State.

[¶38]  The potential conflict between the application of the Act and the language of the Maine Constitution itself, particularly in light of the relevant State and constitutional history, *see infra* ¶¶ 61-63, is an issue of first impression that goes to the very heart of our form of government, rooted as it is in the means by which the people may elect their chosen representatives. *See Opinion of the Justices*, 673 A.2d 693, 695 (Me. 1996).  Therefore, we have no difficulty in agreeing that Question 2 presented by the Senate is an important question of law within the meaning of article VI, section 3 of the Maine Constitution.

c.    Solemn Occasion

[¶39]  With the nature of the new Act and the language of the Maine Constitution in mind, we turn to the challenging process of determining whether Question 2 is asked in the context of a solemn occasion.  Many of the

28

guideposts for determining the existence of a solemn occasion are unquestionably satisfied by Question 2.  The Senate asks on its own behalf and does not seek advice applicable to the acts of another body or Branch.  *See Opinion of the Justices*, 709 A.2d 1183, 1186 (Me. 1997); *Opinion of the Justices*, 680 A.2d 444, 447 (Me. 1996).  It seeks advice on a matter that is not tentative, hypothetical, or remote.[33]  *See Opinion of the Justices*, 371 A.2d 616, 620 (Me. 1977); *Answer of the Justices*, 95 Me. 564, 571-72, 51 A. 224 (1901).  The Question is sufficiently precise and understandable, and does not implicate facts or other provisions of law beyond those cited in the materials submitted to us by the Senate.  *See Opinion of the Justices*, 2015 ME 107, ¶ 5, 123 A.3d 494; *Opinion of the Justices*, 2012 ME 49, ¶¶ 5, 9 & n.1, 40 A.3d 930; *Opinion of the Justices*, 2002 ME 169, ¶ 6, 815 A.2d 791; *Opinion of the Justices*, 460 A.2d 1341, 1345 (Me. 1982).  Neither is the Question overly complex.  *See Opinion of the Justices*, 2004 ME 54, ¶ 41, 850 A.2d 1145.  The Senate also seeks guidance about a matter as applicable to the general public as any matter ever could be, and it does not ask whether the Court will overrule a prior decision.  *See Opinion of the Justices*, 396 A.2d at 225; *Opinion of the Justices*, 157 Me. 152, 157-61,

---

[33] The Attorney General represents that, of the most recent eleven gubernatorial elections, nine were won by a plurality—but not a majority—of votes.

170 A.2d 652 (1961); *Answer of the Justices*, 95 Me. at 566, 569, 51 A. 224; *Answer of the Justices*, 85 Me. 545, 546, 27 A. 454 (1891).

[¶40]  We also conclude that the live gravity and unusual exigency requirements are satisfied.  In less than eighteen months, the Maine voters will go to the polls to elect a new Governor along with their Senators and Representatives.  The Act is presently in force and will dictate how the votes from that election will be processed.  The potential for a constitutional challenge to those election results and ensuing upheaval is real.  Although the next election in which the ranked-choice voting system will be used is many months away, those months will be consumed with creating the documents, systems, and technology necessary to provide a credible election procedure. *See* L.D. 1557, § 6.  Both campaigning and voting will be substantially affected by the nature of the voting process.  The time to plan and organize a fair and impartial election is at hand and the doubt surrounding the constitutionality of the Ranked-Choice Voting Act casts uncertainty on all aspects of voting preparation.  *See Storer v. Brown*, 415 U.S. 724, 730 (1974) ("[A]s a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes."); *Me. Taxpayers Action Network v. Sec'y of State*,

2002 ME 64, ¶ 8, 795 A.2d 75. Thus, we conclude that both the live gravity and unusual exigency requirements are satisfied as to Question 2.

[¶41] The remaining guideposts of a solemn occasion, however—the doubt about the body's authority and the status of the law in question—present a much closer question and require further discussion.

[¶42] The matter before us presents a unique set of circumstances.[34] The Senate does not question its *authority* to act. It is candid in its acknowledgement that it has no doubt about its authority to amend, repeal, replace, or clarify the Act, or to propose a constitutional amendment. *See* Me. Const. art. IV, pt. 3, § 9; Me. Const. art. X, § 4.

[¶43] The Act was passed by citizen initiative on November 8, 2016. The statute was self-executing; it automatically became effective by operation of the Maine Constitution on January 7, 2017. There is no uncertainty as to the status of the Act; it is in effect. *See* Me Const. art. IV, pt. 3, § 19; *Allen v. Quinn*, 459 A.2d 1098, 1103 (Me. 1983).

[¶44] Also unique to the citizen-initiated statutory process is the fact that once the people have voted, a citizen initiative does not require any further

---

[34] As noted previously, the authority of the body to act is not actually in question when, for example, a Governor seeks the Justices' opinion on the constitutionality of a bill that is before him for possible signature. *See supra* n.29.

action of the Governor or the Legislature. *See Allen*, 459 A.2d at 1103. Thus, in contrast to a legislatively initiated bill, neither the Governor nor either chamber of the Legislature would have had the ordinary opportunity to seek the opinions of the Justices regarding their "authority" to act on a possibly unconstitutional proposal after the people have voted. *See supra* n.29.

[¶45]  The Senate, recognizing the unusual context of its Questions, asserts that it nevertheless requires guidance from the Justices for three reasons: (1) "so that it may determine, during the current legislative session, whether it is necessary to propose constitutional amendments for submission to the voters for approval in November 2017"; (2) to decide "whether to authorize and appropriate in excess of $1,500,000 in the biennial budget for the period beginning July 1, 2017 to implement the Act," including for the purchase of "new voting equipment and computer software, staff positions, ballot printing and transportation and storage of ballots for counting in a central location"; and (3) to avoid "uncertainty over the outcome of any future election contests involving more than 2 candidates."

[¶46]  The Senate notes the significant consequences of allowing the election to go forward pursuant to the Ranked-Choice Voting Act if the Act is not consistent with the Maine Constitution. Specifically, it seeks the advice of

the Justices because "failing to address important and unresolved questions of law about the constitutionality of ranked-choice voting before the end of the current legislative session would create uncertainty over the outcome of any future election contests involving more than 2 candidates."

[¶47] Thus, the issue at hand is whether the context in which Question 2 is propounded presents such distinct circumstances that we should provide advice despite the principles that would ordinarily cause us to decline to do so. In most instances where a question has been presented in this posture, we have declined to find the existence of a solemn occasion, and we are likely to do so in future instances. Given the nature of the inquiry from the Senate and the course of events through which it is advanced, however, we would be remiss if we refused to acknowledge the unique and historically significant situation in which the Senate now finds itself.

[¶48] Ours is a representative democracy. *Opinion of the Justices*, 461 A.2d 701, 704 (Me. 1983); *see Powell v. McCormack*, 395 U.S. 486, 547 (1969). "A fundamental principle of our representative democracy is, in [Alexander] Hamilton's words, 'that the people should choose whom they please to govern them.'" *Powell*, 395 U.S. at 547 (quoting 2 The Debates in the Several State Conventions on the Adoption of the Federal Constitution, as

Recommended by the General Convention at Philadelphia, in 1787 at 257 (Jonathan Elliot ed., 2d ed. 1836)). Because this entire system of government is founded on the people's choice of who will represent them, the right to vote is regarded as "preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886).

[¶49] Although it need hardly be said, we reiterate that "[v]oting is a fundamental right, it is at the heart of our democratic process." *Crafts v. Quinn*, 482 A.2d 825, 830 (Me. 1984). The public's trust in the election process is therefore at the forefront of our concern. "[P]ublic confidence in the integrity of the electoral process . . . encourages citizen participation in the democratic process." *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 197 (2008); *see Duplantier v. United States*, 606 F.2d 654, 668 n.30 (5th Cir. 1979) (discussing the erosion of public confidence in the government as exhibited by low voter turnout).

[¶50] For the first time in Maine's history, the voters have acted to change a fundamental aspect of the way they will elect their leaders using a statutory mechanism rather than a constitutional amendment. *See* Me. Const. art. IV, pt. 1, § 5 (amended 1864); Me. Const. art. IV, pt. 2, § 4 (amended 1875);

Me. Const. art. V, pt. 1, § 3 (amended 1880); Resolves 1864, ch. 344; Resolves 1875, ch. 98; Resolves 1880, ch. 159; *infra* ¶¶ 61-63.

[¶51] As with many statutes enacted through citizen initiative, the Ranked-Choice Voting Act does not delineate several aspects of implementation. Nor, once the citizen initiative was presented to the voters, did the Legislature or the Governor have the opportunity to seek an Advisory Opinion before the bill became law. *See* Me. Const. art. IV, pt. 3, § 19.

[¶52] If the Act is constitutional, the Senate may decide to authorize and appropriate funding to effectuate it. If the Act is unconstitutional, the Senate may decide to take no action to implement it and instead take action to repeal it or to consider initiating the process for a constitutional amendment to accomplish the people's will. Although the Senate alone cannot implement or repeal any legislative measure, neither can the implementation or repeal occur without action by the Senate. *See* Me. Const. art. IV, pt. 3, § 2; Me. Const. art. IV, pt. 3, § 9; Me. Const. art. X, § 4; 5 M.R.S. § 1666-A (2016). If the changes must be implemented through amendments to the Maine Constitution, the Senate may take steps toward allowing the people to vote on those amendments.

[¶53] The Senate represents that, without our advice, it is unsure how to proceed. If the Senate leaves in place a statute that is contrary to the current

language of the Constitution and that statute is later challenged in the context of actual election results, the consequence could well be the necessity of one or more repeat elections.

[¶54]   Aside from the expense and delay of such an outcome, repeat elections carry the significant potential to create government instability.  That very process led to the brave stand of Joshua Chamberlain in 1880: "[I]t is for me to see that the laws of this state are put into effect, without fraud, without force, but with calm thought and sincere purpose.  I am here for that, and I shall do it.  If anybody wants to kill me for it, here I am.  Let him kill!"  Alice Rains Trulock, In the Hands of Providence 358 (1992); *see Ex parte Siebold*, 100 U.S. 371, 382 (1880) ("In the light of recent history and of the violence, fraud, corruption and irregularity which have frequently prevailed at such elections, it may easily be conceived that the exertion of the power, if it exists, may be necessary to the stability of our frame of government."); *Buonanno v. DiStefano*, 430 A.2d 765, 770 (R.I. 1981) ("[T]here is a strong public policy favoring stability and finality of election results.").

[¶55]   In short, the State of Maine is faced with potential uncertainty in its election process, and we cannot ignore the historical ramifications of

previous election upheaval.[35]   The situation is serious and unusual.  In these

unique circumstances, we conclude that Question 2 indeed presents a solemn

occasion.  To conclude otherwise would be to elevate our judicially created

interpretations of "solemn occasions" above the reality of this unprecedented

and historically profound event.

2.      Questions 1 and 3

[¶56]  As noted below, we conclude that, given our answer to Question 2,

Questions 1 and 3 do not present a solemn occasion.  *See infra* ¶ 69.

C.      Constitutionality of the Ranked-Choice Voting Act

1.      Principles of Statutory and Constitutional Construction

[¶57]  We therefore provide the following Advisory Opinion regarding

the constitutionality of the Ranked-Choice Voting Act, comparing that statute,

21-A M.R.S. §§ 1(27-C), 1(35-A), 601(2)(J), 722(1), 723-A; L.D. 1557, §§ 1-6,

---

[35]  As we discuss in further detail, *see infra* ¶¶ 61-63, Maine underwent a period of election instability in the mid- to late-1800s in which repeat elections were held, victors were declared by alternate means, public opinion soured, and violence erupted; these events culminated in amendments to the Constitution requiring that State legislators and the Governor be elected by a plurality rather than a majority.  *See* Resolves 1864, ch. 344; Resolves 1875, ch. 98; Resolves 1880, ch 159; *Answers of the Justices*, 70 Me. 600, 600-08 (1880); *Answers of the Justices*, 70 Me. 570, 570-82 (1880); *Answer of the Justices*, 35 Me. 563, 563-64 (1854); Tinkle, *The Maine State Constitution* 12 (2d ed. 2013).

with the relevant provisions of the Maine Constitution, Me. Const. art. IV, pt. 1, § 5; Me. Const. art. IV, pt. 2, § 4; Me. Const. art. V, pt. 1, § 3.

[¶58]  Our construction of the Maine Constitution depends primarily on its plain language, which is interpreted to mean whatever it would convey to "an intelligent, careful voter." *Opinion of the Justices*, 673 A.2d 1291, 1297 (Me. 1996); *see Allen*, 459 A.2d at 1100.  "Constitutional provisions are accorded a liberal interpretation in order to carry out their broad purpose, because they are expected to last over time and are cumbersome to amend." *Opinion of the Justices*, 673 A.2d at 1297 (quotation marks omitted).

[¶59]  Citizen-initiated legislation is also liberally construed, enacted, as it is, by "the people, as sovereign." *Opinion of the Justices*, 275 A.2d 800, 803 (Me. 1971); *see League of Women Voters*, 683 A.2d at 771; *Allen*, 459 A.2d at 1102-03.  Citizen initiatives are reviewed according to the same rules of construction as statutes enacted by vote of the Legislature.  *Opinion of the Justices*, 2004 ME 54, ¶ 10, 850 A.2d 1145; *League of Women Voters*, 683 A.2d at 771.  Thus, a statute enjoys a "heavy presumption" of constitutionality, it is the burden of the party challenging the statute to establish that it is unconstitutional, and the challenging party must meet that burden beyond a reasonable doubt.  *Opinion of the Justices*, 2004 ME 54, ¶ 10, 850 A.2d 1145;

*League of Women Voters*, 683 A.2d at 771-72. Moreover, a party challenging the facial constitutionality of a statute must establish that there is "no set of circumstances" in which the statute could be read to be constitutional, even if the only constitutional interpretation is cumbersome or introduces additional delay or expense. *Guardianship of Chamberlain*, 2015 ME 76, ¶ 10, 118 A.3d 229 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). There are several reasons why facial constitutional challenges are disfavored, including that they are decided on "factually barebones records," risk an exposition of constitutional law "broader than is required by the precise facts to which it is to be applied," and "threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *Id.* ¶ 9 & n.4 (quotation marks omitted).

2.    Analysis Regarding Question 2

[¶60]  The Senate and others argue that the Ranked-Choice Voting Act violates the plurality requirements of the Maine Constitution. The Attorney General has provided an opinion to the Senate in which she has concluded, "L.D. 1557 thus conflicts with the constitutional requirement that winners be determined by 'a plurality' of all the votes."

[¶61]  In arguing that the Act is unconstitutional, the Senate and others rely heavily on the constitutional history of the plurality requirement.  As originally established when Maine became a State in 1820, the Maine Constitution provided for the election of Senators, Representatives, and the Governor by a majority vote.[36]  Me. Const. art. IV, pt. 1, § 5 (1820) (providing, as to Representatives, that "any person shall be elected by a majority of all the votes"); Me. Const. art. IV, pt. 2, § 4 (1820) (providing, as to Senators, for the summons of "such persons, as shall appear to be elected by a majority of the votes in each district"); Me. Const. art. V, pt. 1, § 3 (1820) (providing, as to the Governor, for a "choice by a majority of all the votes returned").

[¶62]  Between 1830 and 1880, a number of elections yielded no candidate who achieved a majority vote.  *Answers of the Justices*, 70 Me. 600, 600-08 (1880); *Answers of the Justices*, 70 Me. 570, 570-82 (1880); *Answer of the Justices*, 35 Me. 563, 563-64 (1854); *Answer of the Justices*, 7 Me. 483, 483-88

---

[36]  A plurality refers to the "highest number of votes."  *Rockefeller v. Matthews*, 459 S.W.2d 110, 111 (Ark. 1970) (quotation marks omitted); *State ex rel. Attorney Gen. v. Anderson*, 12 N.E. 656, 658 (Ohio 1887) (stating that a "plurality" refers to "the greatest of any number of unequal divisions of the whole body").  A majority, in contrast, refers to "more than one-half," that is, greater than fifty percent.  *Baxter v. Davis*, 113 P. 438, 438 (Or. 1911); *see Gilmore v. Civil Serv. Bd.*, 528 So. 2d 1271, 1272 (Fla. Dist. Ct. App. 1988) (defining a "majority" as "any number larger than one-half of the total"); *Anderson*, 12 N.E. at 658-59 (stating that a "majority" is "the greater of any two unequal divisions of the whole body").  Thus, a plurality of the vote may be obtained by garnering less than half of the votes as long as no other candidate obtained more.  A majority is always a plurality; a plurality may be, but is not necessarily, a majority.

40

(1830); Sen. Report No. 38, at 8 (24th Legis. 1844); Committee of Elections, Report to the 10th Legislature (Feb. 1830). In those circumstances, the alternative means for election provided by the 1820 Constitution had to be utilized. For Representatives, that meant holding a series of new elections until a candidate won a majority. Me. Const. art. IV, pt. 1, § 5 (1820). For Senators, that meant that the Representatives and the members of the Senate who had been elected by a majority would elect the winners by joint ballot. Me. Const. art. IV, pt. 2, § 5 (1820). For Governor, it meant the House would select two of the candidates from those four candidates who received the highest number of votes and the Senate would elect the winner of those two. Me. Const. art. V, pt. 1, § 3 (1820).

[¶63] The result was widespread discontent—and, in 1879, threats of violence, which were quelled by the efforts of Joshua Chamberlain—caused by the expense and delay of holding repeat elections, by the election of candidates through legislative action rather than based on the will of the people, and by the claims of manipulation and allegations of self-dealing levied by opponents of the eventually-declared winners. *See* Sen. Report No. 38 (24th Legis. 1844); Committee of Elections, Report to the 10th Legislature 6 (Feb. 1830); Tinkle, *The Maine State Constitution* 12 (2d ed. 2013). In response to these challenges,

by 1880, all three provisions had been amended to replace "majority" with "plurality" as is now found in the Constitution.[37]  Resolves 1864, ch. 344 (Representatives); Resolves 1875, ch. 98 (Senators); Resolves 1880, ch. 159 (Governor).  The plurality requirements in these constitutional provisions have not changed since 1880.

[¶64]  As last amended to address the public's lack of confidence in the elective process in 1880, the language of the Maine Constitution today is clear. For Maine Senators, Maine Representatives, and the Governor alike, an election is won by the candidate that first obtains "a plurality of" all votes returned. Me. Const. art. IV, pt. 1, § 5; Me. Const. art. IV, pt. 2, § 4; Me. Const. art. V, pt. 1, § 3.

[¶65]  The Act, in contrast, provides for the tabulation of votes in rounds. 21-A M.R.S. §§ 722(1), 723-A(2); L.D. 1557, §§ 4-5.  Thus, the Act prevents the recognition of the winning candidate when the first plurality is identified. According to the terms of the Constitution, a candidate who receives a plurality of the votes would be declared the winner in that election.  The Act, in contrast, would not declare the plurality candidate the winner of the election, but would

---

[37]  In 1848, the "majority" requirement as to Representatives was changed to "the highest number." Resolves 1848, ch. 84.  The 1864 amendment then changed "the highest number," in the context of the election of Representatives, to "a plurality."  Resolves 1864, ch. 344.

42

require continued tabulation until a majority is achieved or all votes are exhausted.[38] Accordingly, the Act is not simply another method of carrying out the Constitution's requirement of a plurality. In essence, the Act is inapplicable if there are only two candidates, and it is in direct conflict with the Constitution if there are more than two candidates.

[¶66] The discrepancy between the Act and the Constitution is easily illustrated by the simplest of scenarios. If, after one round of counting, a candidate obtained a plurality of the votes but not a majority, that candidate would be declared the winner according to the Maine Constitution as it currently exists. According to the Act, however, that same candidate would not then be declared the winner.

[¶67] Instead, the candidate, though already having obtained a plurality of the votes, would be subject to additional rounds of counting in which second, third, and fourth choices are accounted for and the lowest vote-garnering candidates are successively eliminated. Once those additional rounds are completed, a different candidate may be declared the winner—not because that

---

[38] It is possible that, if a ballot becomes "exhausted" in the ranked-choice voting process, either through the elimination of all candidates on a voter's ballot or by the voter's failure to name additional ranked candidates, 21-A M.R.S. § 723-A(1)(D), (2); L.D. 1557, § 5, the prevailing candidate could win by a plurality of votes. In those circumstances, because the Act would not declare the first candidate to achieve a plurality to be the winner, it conflicts with the Constitution.

second candidate obtained a plurality of the votes (which the first candidate had already obtained), but because that candidate obtained a *majority* of the votes after eliminating other candidates by taking into account the second, third, and fourth place preferences, or because the ballots have been exhausted. In this way, the Act prevents the candidate obtaining a "plurality" from being named the winner unless and until multiple rounds of vote-counting have occurred.

[¶68]  We therefore answer Question 2 in the affirmative.

3.    Questions 1 and 3

[¶69]   Because we have unanimously opined that the Ranked-Choice Voting Act is in direct contradiction to the plurality requirements of the Maine Constitution and therefore provide our opinion that it violates the Constitution, we assume the Senate needs no further advice as to Questions 1 and 3 because those Questions address the mechanisms by which that process is carried out. We therefore conclude that Questions 1 and 3 do not present a solemn occasion given our answer to Question 2, and we decline to answer Questions 1 and 3.

### III. CONCLUSION

[¶70]  For the first time in Maine's history, the method by which the people of Maine vote for their Governor, their chosen Senators, and their chosen Representatives has been substantially altered through the enactment of a statute rather than through a constitutional amendment.  The Question inquiring about a conflict between the application of that statute—the Ranked-Choice Voting Act—and the language of the Maine Constitution presents an important question of law.  The looming uncertainty in the means by which the people may elect their chosen representatives, coupled with our responsibility to provide advice when "required," leads us to conclude that this is a unique and unusual circumstance in which a solemn occasion has been presented.  Me. Const. art. VI, § 3.

[¶71]  We answer only one of the Questions propounded because answers to the other Questions are unnecessary in light of our Advisory Opinion on Question 2.

[¶72]  The Senate asks:

> Question 2. Does the method of ranked-choice voting established by the Act in elections for Representative, Senator and Governor violate the provisions of the Constitution of Maine, Article IV, Part First, Section 5, Article IV, Part Second, Sections 3 and 4 and Article V, Part First, Section 3, respectively, which declare that the person elected shall be the candidate who receives a

plurality of all the votes counted and declared by city and town officials as recorded on lists returned to the Secretary of State?

The seven Justices of the Maine Supreme Judicial Court respond:

Yes, the Ranked-Choice Voting Act conflicts with the Maine Constitution.


Signed:  May 23, 2017                    Each Justice Individually Opining.

                                         For the Justices,


                                         _____/s/_____
                                         LEIGH I. SAUFLEY
                                         Chief Justice
                                         DONALD G. ALEXANDER
                                         ANDREW M. MEAD
                                         ELLEN A. GORMAN
                                         JOSEPH M. JABAR
                                         JEFFREY L. HJELM
                                         THOMAS E. HUMPHREY

_____

Timothy C. Woodcock, Esq. (orally), Ryan P. Dumais, Esq., and Kady S. Huff, Esq., Eaton Peabody, Bangor, for the Maine State Senate

Catherine R. Connors, Esq., and Joshua D. Dunlap, Esq. (orally), Pierce Atwood, LLP, Portland, for the Maine House Republican Caucus and the Maine Heritage Policy Center

Janet T. Mills, Attorney General, Susan P. Herman, Dep. Atty. Gen., Phyllis Gardiner, Asst. Atty. Gen. (orally), and Thomas A. Knowlton, Asst. Atty. Gen., Office of the Attorney General, Augusta, for the Attorney General and the Secretary of State

Katherine R. Knox, Esq., Bernstein Shur, Augusta, for Senators Troy Jackson, Mark Dion, Shenna Bellows, Ben Chipman, Justin Chenette, Rebecca Millett, David Miramant, and Eloise Vitelli

James T. Kilbreth, Esq. (orally), David M. Kallin, Esq., and Emily T. Howe, Esq., Drummond Woodsum, Portland, for The Committee for Ranked Choice Voting

Rachel M. Wertheimer, Esq. (orally), Jonathan M. Dunitz, Esq., Marie J. Mueller, Esq., and Samuel J. Baldwin, Esq., Verrill Dana LLP, Portland, for the League of Women Voters of Maine and Maine Citizens for Clean Elections

Clifford Ginn, Esq., Ginn Law, LLC, Scarborough, T. Clark Weymouth, Esq., Hogan Lovells US LLP, Washington, D.C., and G. Michael Parsons, Jr., Esq., Akin Gump Strauss Hauer & Feld LLP, Washington, D.C., for FairVote

Marshall J. Tinkle, Esq., Thompson, MacColl & Bass, LLC, PA, Portland, pro se

Dmitry Bam, Esq., University of Maine School of Law, Portland, pro se

Larry Diamond, Hoover Institution, Stanford, California, pro se

## APPENDIX A

The parties who submitted briefs take the following positions:

| | | |
|---|---|---|
| Maine Senate | Solemn occasion | Unconstitutional |
| Maine House Republican Caucus and Maine Heritage Policy Center | Solemn occasion | Unconstitutional |
| Attorney General | Solemn occasion | Unconstitutional |
| Secretary of State | Solemn occasion | Unconstitutional |
| Senators Troy Jackson, Mark Dion, Shenna Bellows, Ben Chipman, Justin Chenette, Rebecca Millett, David Miramant, and Eloise Vitelli | No solemn occasion | No position |
| The Committee for Ranked Choice Voting | No solemn occasion | Constitutional |
| League of Women Voters of Maine and Maine Citizens for Clean Elections | No solemn occasion | Constitutional |
| FairVote | No solemn occasion | Constitutional |
| Marshall Tinkle | No solemn occasion | Constitutional |
| Dmitry Bam | No position | Constitutional |
| Larry Diamond | No position | Constitutional |

APPENDIX B



# 127th MAINE LEGISLATURE

## SECOND REGULAR SESSION-2016

**Legislative Document**                                                                                                **No. 1557**

I.B. 2                                                                                House of Representatives, January 14, 2016

### An Act To Establish Ranked-choice Voting

Transmitted to the Clerk of the 127th Maine Legislature by the Secretary of State on January 12, 2016 and ordered printed.

ROBERT B. HUNT
Clerk

Printed on recycled paper

**Be it enacted by the People of the State of Maine as follows:**

**Sec. 1. 21-A MRSA §1, sub-§27-C** is enacted to read:

**27-C. Office elected by ranked-choice voting.** "Office elected by ranked-choice voting" means any of the following offices: United States Senator, United States Representative to Congress, Governor, State Senator and State Representative, and includes any nominations by primary election to such offices.

**Sec. 2. 21-A MRSA §1, sub-§35-A** is enacted to read:

**35-A. Ranked-choice voting.** "Ranked-choice voting" means the method of casting and tabulating votes in which voters rank candidates in order of preference, tabulation proceeds in sequential rounds in which last-place candidates are defeated and the candidate with the most votes in the final round is elected.

**Sec. 3. 21-A MRSA §601, sub-§2, ¶J** is enacted to read:

J. For offices elected by ranked-choice voting, the ballot must be simple and easy to understand and allow a voter to rank candidates for an office in order of preference. A voter may include no more than one write-in candidate among that voter's ranked choices for each office.

**Sec. 4. 21-A MRSA §722, sub-§1,** as amended by PL 2009, c. 253, §36, is further amended to read:

**1. How tabulated.** The Secretary of State shall tabulate all votes that appear by an election return to have been cast for each question or candidate whose name appeared on the ballot. For offices elected by ranked-choice voting, the Secretary of State shall tabulate the votes according to the ranked-choice voting method described in section 723-A. The Secretary of State shall tabulate the votes that appear by an election return to have been cast for a declared write-in candidate and shall tabulate the votes that appear to have been cast for an undeclared write-in candidate based on a recount requested and conducted pursuant to section 737-A, subsection 2-A.

**Sec. 5. 21-A MRSA §723-A** is enacted to read:

**§723-A. Determination of winner in election for an office elected by ranked-choice voting**

**1. Definitions.** As used in this section, unless the context otherwise indicates, the following terms have the following meanings.

A. "Batch elimination" means the simultaneous defeat of multiple candidates for whom it is mathematically impossible to be elected.

B. "Continuing ballot" means a ballot that is not an exhausted ballot.

C. "Continuing candidate" means a candidate who has not been defeated.

D. "Exhausted ballot" means a ballot that does not rank any continuing candidate, contains an overvote at the highest continuing ranking or contains 2 or more sequential skipped rankings before its highest continuing ranking.

E. "Highest continuing ranking" means the highest ranking on a voter's ballot for a continuing candidate.

F. "Last-place candidate" means the candidate with the fewest votes in a round of the ranked-choice voting tabulation.

G. "Mathematically impossible to be elected," with respect to a candidate, means either:

(1) The candidate cannot be elected because the candidate's vote total in a round of the ranked-choice voting tabulation plus all votes that could possibly be transferred to the candidate in future rounds from candidates with fewer votes or an equal number of votes would not be enough to surpass the candidate with the next-higher vote total in the round; or

(2) The candidate has a lower vote total than a candidate described in subparagraph (1).

H. "Overvote" means a circumstance in which a voter has ranked more than one candidate at the same ranking.

I. "Ranking" means the number assigned on a ballot by a voter to a candidate to express the voter's preference for that candidate. Ranking number one is the highest ranking, ranking number 2 is the next-highest ranking and so on.

J. "Round" means an instance of the sequence of voting tabulation steps established in subsection 2.

K. "Skipped ranking" means a circumstance in which a voter has left a ranking blank and ranks a candidate at a subsequent ranking.

**2. Procedures.** Except as provided in subsections 3 and 4, the following procedures are used to determine the winner in an election for an office elected by ranked-choice voting. Tabulation must proceed in rounds. In each round, the number of votes for each continuing candidate must be counted. Each continuing ballot counts as one vote for its highest-ranked continuing candidate for that round. Exhausted ballots are not counted for any continuing candidate. The round then ends with one of the following 2 potential outcomes.

A. If there are 2 or fewer continuing candidates, the candidate with the most votes is declared the winner of the election.

B. If there are more than 2 continuing candidates, the last-place candidate is defeated and a new round begins.

**3. Ties.** A tie under this section between candidates for the most votes in the final round or a tie between last-place candidates in any round must be decided by lot, and the candidate chosen by lot is defeated. The result of the tie resolution must be recorded and reused in the event of a recount. Election officials may resolve prospective ties between candidates before the election.

ranked-choice voting ballot and tabulation is permitted in accordance with the following.

A. The number of allowable rankings may be limited to no fewer than 6.

B. Two or more candidates may be defeated simultaneously by batch elimination in any round of tabulation.

**5. Effect on rights of political parties.** For all statutory and constitutional provisions in the State pertaining to the rights of political parties, the number of votes cast for a party's candidate for an office elected by ranked-choice voting is the number of votes credited to that candidate after the initial counting in the first round described in subsection 2.

**6. Application.** This section applies to elections held on or after January 1, 2018.

**Sec. 6. Application.** This Act applies to elections held on or after January 1, 2018.

## SUMMARY

This initiated bill provides ranked-choice voting for the offices of United States Senator, United States Representative to Congress, Governor, State Senator and State Representative for elections held on or after January 1, 2018. Ranked-choice voting is a method of casting and tabulating votes in which voters rank candidates in order of preference, tabulation proceeds in rounds in which last-place candidates are defeated and the candidate with the most votes in the final round is elected.